**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 12-5030**

─────────────

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

      v.

ERASTO GOMEZ-JIMENEZ,

              Defendant - Appellant.

─────────────

**No. 13-4059**

─────────────

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

      v.

AARON JUAREZ-GOMEZ,

              Defendant - Appellant.

─────────────

Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Dever III, Chief District Judge.  (5:11-cr-00375-D-2; 5:11-cr-00375-D-1)

─────────────

Argued:  January 28, 2014       Decided:  April 24, 2014

─────────────

Before NIEMEYER, GREGORY, and AGEE, Circuit Judges.

─────────────

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Niemeyer joined. Judge Gregory wrote a separate opinion concurring in part and dissenting in part.

—————————

**ARGUED:** Paul K. Sun, Jr., ELLIS & WINTERS LLP, Raleigh, North Carolina, for Appellant Erasto Gomez-Jimenez; Joseph Bart Gilbert, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant Aaron Juarez-Gomez. Joshua L. Rogers, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas P. McNamara, Federal Public Defender, Stephen C. Gordon, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant Aaron Juarez-Gomez. Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Yvonne V. Watford-McKinney, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

—————————

AGEE, Circuit Judge:

Before the court are two related cases that we have consolidated. In one case, Erasto Gomez-Jimenez ("Erasto") appeals the district court's judgment sentencing him to 180 months' imprisonment by challenging the application of several sentencing enhancements. In the other case, Aaron Juarez-Gomez ("Juarez-Gomez") seeks review of two of the six counts of which he was convicted and also argues that the district court erred in the application of several sentencing enhancements in determining his sentence of 390 months' imprisonment.

For the reasons set forth below, we affirm the judgment of the district court in each case.

I

Sergeant Todd Marshburn, an officer with the Raleigh, North Carolina Police Department, received a tip from an informant regarding a man selling cocaine in the Raleigh area. Upon Sgt. Marshburn's request, the informant introduced another individual, the confidential informant ("CI"), to the suspected drug dealer. The CI arranged to meet the suspect at a Burger King restaurant to purchase 14 grams of cocaine.

At the time of the arranged meeting, Juarez-Gomez arrived at the Burger King driving a yellow, four-door Chevrolet S-10 truck with a personalized, North Carolina license plate that

3

read "GOMEZ."[1] The CI purchased 13.7 grams of cocaine from Juarez-Gomez for $500 and took Juarez-Gomez's phone number to arrange future meetings directly.

The next day, the CI contacted Juarez-Gomez and asked to purchase another 14 grams of cocaine. Juarez-Gomez agreed to make another sale in the parking lot of a grocery store. Juarez-Gomez arrived at the parking lot in the same yellow truck and exchanged 14.1 grams of cocaine for $500 with the CI. During this meeting, the CI asked Juarez-Gomez if he was able to sell a solid piece of cocaine rather than powder cocaine. Juarez-Gomez indicated that he had only powder cocaine but provided the CI with a small sample of crack cocaine. Following the drug transaction, Raleigh Police Detective Jeffrey Marbrey and other officers followed Juarez-Gomez, who eventually led them to a mobile home, where the officers observed the parked yellow truck adjacent to the trailer.

The following day, the CI arranged to purchase 28 grams of cocaine from Juarez-Gomez. The CI met Juarez-Gomez at a gas station, where Juarez-Gomez arrived in the same yellow truck. Juarez-Gomez exchanged 27.9 grams of cocaine for $900 with the CI, who asked Juarez-Gomez to sell him greater quantities of

---

[1] Officers later checked the motor vehicle registration of the truck and found that it was not registered to Juarez-Gomez, but the truck matched the description that the informant previously gave police of the suspect's vehicle.

cocaine, stating that he had "lots of money" and did not want to have to meet every day to purchase smaller amounts. Juarez-Gomez told the CI that he would introduce him to his boss for that purpose.

Following the drug transaction, Detective Marbrey again followed Juarez-Gomez to the trailer and parked in a position that allowed observation of the road to the trailer. Detective Marbrey then made contact with the landlord of the trailer, and asked the landlord to call him when the yellow truck left the trailer.

The next day, the CI again arranged to meet with Juarez-Gomez to purchase two ounces of cocaine for $2,000. About one hour before the meeting, the landlord called Detective Marbrey and informed him that the yellow truck had left the trailer. Juarez-Gomez arrived at the location of the drug sale in the same yellow truck, entered the CI's vehicle, and began speaking with the CI. Upon the CI's signal, officers took both men into custody and seized two ounces of cocaine, one gram of crack, and an additional small amount of powder cocaine from the headliner of the yellow truck.

Following the arrest, police officers approached the mobile home and knocked on the door. A.G., a minor later revealed to be Juarez-Gomez's son, answered the door and granted officers permission to enter the trailer. At that point, officers noticed

5

another man in the trailer, Erasto Gomez-Jimenez. At the same time, Pedro Gomez-Jimenez ("Pedro") fled the trailer into the surrounding woods, but was pursued and apprehended by police.

A.G. then consented to a search of the trailer for narcotics. Officers conducted a cursory search of the trailer for safety and observed, in plain view, digital scales, clear plastic bags, and a pistol. Officers then obtained a search warrant and conducted a full search of the trailer. Among other things, officers found over 700 grams of crack cocaine, a ledger of drug sales, pictures of Pedro posing with firearms, a small amount of marijuana, five kilograms of powder cocaine (some in brick form), several cell phones, several firearms, 1615 grams of liquid cocaine, and over $55,000 cash. Officers also found a rental receipt for the trailer in A.G.'s wallet and an electric bill for the trailer bearing Erasto's name.

A cooperating witness ("CW") provided officers additional information regarding the drug activities of Juarez-Gomez, Pedro, and Erasto. The CW stated that he engaged in a number of drug transactions with Pedro and Erasto together, and that A.G. attended several of these drug deals. The CW further stated that he met Pedro and A.G. at a storage facility where Pedro was extracting cocaine base from liquid cocaine with A.G.'s assistance.

6

Juarez-Gomez, Pedro, and Erasto were then named in a seven-count indictment filed in the Eastern District of North Carolina. Count One charged all three men with conspiracy to distribute and possess with intent to distribute 280 grams or more of cocaine base and five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) & 846. Counts Two through Five charged Juarez-Gomez with distribution of a quantity of cocaine on four separate dates in violation of 21 U.S.C. § 841(a)(1). Count Six charged all three men with possession with intent to distribute 280 grams or more of cocaine base and five kilograms or more of cocaine and aiding and abetting the same in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count Seven charged Juarez-Gomez with being an alien in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(5) & 924.

Without the benefit of a plea agreement, Pedro and Erasto pleaded guilty to Counts One and Six.[2] Juarez-Gomez pleaded not guilty to all counts and proceeded to a trial by jury, where he

---

[2] The district court held a sentencing hearing for Pedro, sentencing him to 180 months' imprisonment on Counts One and Six. Pedro appealed his sentence, and we affirmed in a separate proceeding. See United States v. Gomez-Jimenez, No. 12-5009, 2013 WL 5977153 (4th Cir. Nov. 12, 2013). No aspect of Pedro's guilty plea or sentence is before us in this appeal. References to Pedro herein are for the purpose of analyzing the evidence in regard to the issues raised by Juarez-Gomez and Erasto.

was found guilty of Counts One through Six and not guilty of Count Seven.

The United States Probation Office prepared a presentence investigation report ("PSR") for each defendant. In Erasto's PSR, the probation officer concluded that he was accountable for 8,463.62 grams of cocaine and 732.15 grams of cocaine base, resulting in a base offense level of 34. The probation officer applied a two-level enhancement for possession of a firearm pursuant to section 2D1.1(b)(1) of the United States Sentencing Guidelines (the "Guidelines"). Another two-level enhancement was applied for the use of a minor under Guidelines section 3B1.4, but three levels were subtracted under section 3E1.1(b) for acceptance of responsibility, giving Erasto a total offense level of 35.

The probation officer concluded that Erasto had one criminal history point, resulting in a criminal history category of I. Based upon the total offense level of 35 and criminal history category of I, the probation officer concluded that the Guidelines recommended range of imprisonment was 168 to 210 months. Erasto objected to the two-level enhancements for possession of a firearm and for use of a minor.

At his sentencing hearing, Erasto argued that there was no evidence of A.G.'s participation in the conspiracy beyond his presence at the trailer, which he argued was insufficient to

warrant the enhancement for use of a minor. In response, government counsel argued that the use of a minor enhancement applied because A.G. had paid rent on the trailer, accompanied Erasto to drug deals, and lived in the trailer with Erasto where the drugs and firearms were seized. The district court concluded that Erasto took "an affirmative act to involve a minor in the offense charged," specifically having A.G. accompany him on drug deals. (J.A. No. 12-5030 157–58.) In overruling Erasto's objection, the district court stated that the facts presented were enough to allow the court to draw a reasonable inference that Erasto used A.G. in the commission of his offenses and that A.G.'s involvement was more than mere presence.

Erasto's counsel further argued that the only evidence linking him to the firearms found in the trailer was his presence at the trailer when he was arrested. The district court concluded that the enhancement applied because in addition to his presence in the trailer at the time of his arrest, the energy bills for the trailer were in his name.

The district court then considered the factors listed in 18 U.S.C. § 3553(a), finding that Erasto actively participated in the conspiracy, possessed with intent to distribute both cocaine and cocaine base, and had entered a criminal enterprise to make money as a drug dealer. Further, the district court concluded that the large quantity of drugs combined with the presence of

9

firearms indicated that the enterprise was not a small operation. In announcing a sentence of 180 months' imprisonment for Erasto, the district court stated:

> I do believe that I have calculated the advisory guideline[s] range properly. If, however, it's determined that I have not, I announce pursuant to [United States v. Keene, 470 F.3d 1347 (11th Cir. 2006), and United States v. Savillon-Matute, 636 F.3d 119 (4th Cir. 2011)], that I would have imposed this same sentence as an alternative variant sentence in light of all the 3553 factors.

(J.A. 12-5030 170.)

Juarez-Gomez's PSR found him accountable for 8,575.88 grams of cocaine and 733.55 grams of cocaine base, resulting in a base offense level of 34. The probation officer applied a two-level enhancement for possession of a dangerous weapon pursuant to Guidelines section 2D1.1(b)(1). In addition, a two-level enhancement was applied under section 3B1.1(c) for being an organizer, leader, manager, or supervisor of criminal activity and a further two-level enhancement for use of a minor under section 3B1.4.

The probation officer reviewed Juarez-Gomez's criminal history, finding seven felony convictions and three misdemeanor convictions, resulting in six criminal history points. Two points were added to Juarez-Gomez's criminal history score because he committed the offenses of conviction while on

10

supervised release, thereby yielding a criminal history category of IV. Based upon a total offense level of 40 and a criminal history category of IV, the Guidelines range of imprisonment was between 360 months to life for Counts One and Six and 240 months for Counts Two through Five.

Juarez-Gomez objected to the PSR, contending that he did not live at the trailer and should not be held accountable for the drugs, money, and firearms found there. He also objected to the leadership and use of a minor enhancements, but provided no explanation for those objections.

At Juarez-Gomez's sentencing hearing, the Government presented testimony that Juarez-Gomez had personally leased the trailer and that his son, A.G., paid rent on the trailer "from time to time." (J.A. No. 13-4059 476.) The government presented further testimony that officers found a rental receipt for the trailer in A.G.'s wallet and that A.G. identified one of the bedrooms in the trailer as belonging to Juarez-Gomez. The testimony further showed that A.G. assisted Pedro in extracting cocaine base from liquid cocaine.

After hearing argument from both parties, the district court found that the evidence established Juarez-Gomez's participation in a drug conspiracy based in the trailer. Based upon this finding, the district court concluded that Juarez-Gomez was properly held accountable for the contents of the

11

trailer and that the PSR's drug weight calculation was accurate. With respect to the leadership enhancement, the district court found that Juarez-Gomez was, at the least, "the organizer, leader, manager, or supervisor of his son[, A.G.,] who was residing in" the trailer that Juarez-Gomez leased. The district court further found that Juarez-Gomez sent A.G. to make the rental payments on the trailer. Although there was no evidence that Juarez-Gomez claimed a larger share of the fruits of the conspiracy than his co-conspirators, the district court found that Juarez-Gomez involved A.G. in the conspiracy and was aware of A.G.'s role in it.

As to the use of a minor enhancement, the district court found that Juarez-Gomez had enlisted A.G. in the drug conspiracy by having him pay rent on the trailer and by having him live in the trailer, which was used as a drug stash house. The district court also found that A.G.'s attendance and participation in drug deals with Pedro and Erasto was reasonably foreseeable to Juarez-Gomez.

The district court then considered the factors listed in 18 U.S.C. § 3553(a) and sentenced Juarez-Gomez to concurrent terms of imprisonment of 390 months on Counts One and Six and 240 months on Counts Two through Five. The district court stated that, although it believed it had properly calculated the Guidelines range, it would have imposed the same sentence as a

12

variant sentence pursuant to Keene, 470 F.3d 1347, Savillon-Matute, 636 F.3d 119, and United States v. Hargrove, 701 F.3d 156 (4th Cir. 2012).

Erasto and Juarez-Gomez have each timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a) as to each appeal.

II

On appeal, Juarez-Gomez challenges the sufficiency of the evidence supporting his conviction on Count One, conspiracy to distribute and possess with intent to distribute 280 grams or more of cocaine base and five kilograms or more of cocaine and Count Six, aiding and abetting the same.[3] He also challenges the procedural reasonableness of his sentence, arguing that the district court erred in applying the section 3B1.4 use of a minor enhancement as well as the section 3B1.1(c) leadership enhancement.

Erasto challenges the procedural reasonableness of his sentence, arguing that the district court erred in applying the section 2D1.1(b)(1) possession of a dangerous weapon enhancement and the section 3B1.4 use of a minor enhancement. Erasto also

---

[3] Juarez-Gomez does not challenge his convictions on Counts Two through Five. His convictions on those counts are thus final and not part of this appeal.

challenges the substantive reasonableness of his sentence, arguing that his Guidelines range resulted only from the quantity of drugs found in the trailer, rather than from his conduct or criminal history.

### A    Juarez-Gomez: Sufficiency of the Evidence

When considering a criminal defendant's challenge to the sufficiency of the evidence supporting his conviction, we "must uphold [the jury's] verdict if there is substantial evidence, viewed in the light most favorable to the Government, to support it." United States v. Cardwell, 433 F.3d 378, 390 (4th Cir. 2005). "Substantial evidence is that evidence which a 'reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'" Id. (quoting United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). "In our inquiry, the Government is given 'the benefit of all reasonable inferences from the facts proven to those sought to be established.'" United States v. Allen, 491 F.3d 178, 185 (4th Cir. 2007) (quoting United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982)).

To prove conspiracy, the government must demonstrate beyond a reasonable doubt (1) an agreement between two or more persons to engage in conduct that violates a federal drug law, (2) the

14

defendant's knowledge of the conspiracy, and (3) the defendant's knowing and voluntary participation in the conspiracy. See United States v. Hackley, 662 F.3d 671, 678 (4th Cir. 2011). Such an agreement need not be formal and may instead be a "tacit or mutual understanding between the defendant and his accomplice." Id. at 679 (quotation marks omitted). "Circumstantial evidence alone is sufficient to support a conviction for conspiracy." Id. "The same evidence establishing a defendant's participation in a conspiracy may support a conclusion that a defendant participated in the principal's unlawful intent to possess and distribute drugs, thereby proving guilt of aiding and abetting as well." United States v. Burgos, 94 F.3d 849, 873 (4th Cir. 1996).

On appeal, Juarez-Gomez argues that the only evidence linking him to the trailer's drug activity was testimony that police followed him there after he completed two drug transactions. Further, Juarez-Gomez argues that the government did not prove at trial that A.G. was his son, that Juarez-Gomez lived in the trailer, or that Juarez-Gomez was observed to be physically present inside the trailer.[4] In sum, Juarez-Gomez

---

[4] The government did not present evidence at trial that Juarez-''Gomez had personally leased the trailer. This evidence was only tendered at the sentencing hearing and thus is not considered in the sufficiency of the evidence analysis on Counts One and Six.

argues that evidence that he stopped at the trailer for an undetermined period of time following two drug transactions did not constitute substantial evidence to support the jury's verdict against him on Count One, conspiracy and Count Six, aiding and abetting.

Notwithstanding his argument, Juarez-Gomez concedes that the government "presented strong evidence of his guilt on the four counts of the indictment that alleged he sold or attempted to sell cocaine." (Opening Br. 30.) Juarez-Gomez simply contends that despite this strong, and uncontested, evidence of guilt with respect to Counts Two through Five, the government has not presented substantial evidence linking him to the trailer and, thus, the conspiracy or aiding and abetting. Yet Juarez-Gomez fails to recognize that the government also presented conclusive evidence that the trailer in question was a drug stash house filled with large quantities of cash, cocaine, and firearms, and used for the storage, processing, and packaging for sale of cocaine. The government's trial evidence established that Juarez-Gomez drove to the trailer as a final destination following two cocaine sales, drove from the trailer to a third cocaine sale, and stayed at the trailer overnight.[5] The

---

[5] The record reflects that the government presented evidence at trial sufficient to permit the jury to draw a reasonable inference that Juarez-Gomez stayed at the trailer overnight. The (Continued)

16

government also presented sufficient evidence to allow the jury to infer that Juarez-Gomez's son, A.G., lived in the trailer.[6] This evidence permitted the jury to draw one of two conclusions: either Juarez-Gomez did not enter the trailer or conduct any significant business there, or Juarez-Gomez was connected to the contents of the trailer as well as the individuals residing therein.

Where physical facts and evidence are capable of more than one interpretation and reasonable inferences therefrom can be drawn by a jury, its verdict should not be disturbed. See Glasscock v. United States, 323 F.2d 589, 591 (4th Cir. 1963). It is the jury's duty to weigh contradictory evidence and

government provided testimony indicating that Juarez-Gomez drove to and stopped at the trailer for an extended period of time on two separate days after drug sales. On the second day that Juarez-Gomez drove to the trailer, Detective Marbrey asked the landlord of the trailer to notify him when the yellow truck left the trailer. The landlord called Marbrey the next morning when the truck had departed the trailer, permitting the jury to draw the reasonable inference that Juarez-Gomez stayed at the trailer overnight.

[6] The government presented both argument and evidence at trial sufficient to permit the jury to conclude that A.G. was Juarez-Gomez's son. The government presented evidence that A.G. shared his father's name and that officers informed A.G. that his father, Juarez-Gomez, had been arrested at the time of the search. At trial, Juarez-Gomez objected to a line of questioning revealing that A.G. shared his father's name on grounds of hearsay. The district court overruled that objection, and Juarez-Gomez does not challenge the district court's evidentiary rulings on appeal. Moreover, A.G. was repeatedly referred to as Juarez-Gomez's son, or as "Junior," at trial with no objection from Juarez-Gomez. (See J.A. 208-10, 211, 279.)

inferences, pass on the credibility of witnesses, and draw the ultimate factual conclusions. When there is substantial evidence to support the jury's verdict, as there is in this case, the verdict should not be set aside, even if we were inclined to draw contrary inferences. Id. at 591.

Here, the government's evidence provided the jury with enough circumstantial evidence—Juarez-Gomez's drug sales, his frequent and extended presence at the trailer, his minor son's living situation at the trailer, and the drug-stash contents of the trailer—to support the jury's factual determination that Juarez-Gomez was involved in a conspiracy with, and aided and abetted, the person or persons residing in the trailer. In other words, the jury had sufficient evidence to conclude that Juarez-Gomez's involvement in several cocaine sales supported a reasonable inference that his repeated visits to a drug stash house were less than coincidental. Because we are required on appeal to construe all facts and reasonable inferences in favor of the government, we conclude that the jury's verdict must be upheld.


B    Juarez-Gomez: Use of a Minor Enhancement

"[W]e review the district court's sentencing procedure for abuse of discretion, and must reverse if we find error, unless we can conclude that the error was harmless." United States v.

18

<u>Lynn</u>, 592 F.3d 572, 581 (4th Cir. 2010). In determining whether the district court properly calculated the Guidelines range, we "review the district court's legal conclusions <u>de novo</u> and its factual findings for clear error." <u>United States v. Layton</u>, 564 F.3d 330, 334 (4th Cir. 2009).

Under section 3B1.4 of the Guidelines, a defendant's offense level will be increased by two levels when the defendant "used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense." U.S.S.G. § 3B1.4. "Used or attempted to use" includes any affirmative act "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting" a minor to engage in the charged offense. <u>Id.</u> n.1; <u>see</u> <u>United States v. Taber</u>, 497 F.3d 1177, 1181 (11th Cir. 2007).[7]

---

[7] We note the existence of a circuit split on the issue of whether a defendant must take affirmative steps to involve the minor in the offense or whether that defendant can be held responsible for a co-conspirator's use of a minor when that use is reasonably foreseeable. <u>See</u> <u>United States v. Acosta</u>, 474 F.3d 999, 1002 (7th Cir. 2007) (describing the circuit split). Because we conclude that Juarez-Gomez took affirmative steps to involve A.G. in the drug conspiracy at issue in this case, we need not enter the debate as to whether the section 3B1.4 enhancement could also be applicable only upon evidence that the use of the minor was reasonably foreseeable to the defendant. We also take no position on whether the court's existing precedent in <u>United States v. Moore</u>, applying Guidelines section 3B1.3, also determines co-conspirator accountability under section 3B1.4. <u>See</u> 29 F.3d 175, 179 (4th Cir. 1994) (holding that co-
(Continued)

19

To apply the enhancement, courts generally require evidence of circumstances "beyond the minor's mere presence." United States v. Molina, 469 F.3d 408, 414 (5th Cir. 2006). Still, an "affirmative act" may include the defendant "driving himself and the minor to [a] robbery location," Taber, 497 F.3d at 1181; or "asking the minor to accompany him or her to a crime," United States v. Voegtlin, 437 F.3d 741, 747 (8th Cir. 2006). In fact, when "a defendant's crime is previously planned—when, for example, she leaves the house knowing she is on her way to smuggle drugs . . . the act of bringing the child along instead of leaving the child behind is an affirmative act that involves the minor in the offense" and constitutes more than mere presence. United States v. Mata, 624 F.3d 170, 176 (5th Cir. 2010).

Juarez-Gomez argues that the district court erred in applying the section 3B1.4 enhancement to him because the evidence showed only that A.G. made one rental payment. Juarez-Gomez also posits that the government demonstrated only that A.G. accompanied Pedro and Erasto on drug transactions and provided no evidence that Juarez-Gomez directly involved A.G. in his drug sales.

---

conspirators cannot be held responsible for another member of the conspiracy's abuse of a position of trust under section 3B1.3 of the Guidelines).

20

This argument, however, ignores the evidence in the full record. "[A] sentencing court may give weight to any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy." United States v. Wilkinson, 590 F.3d 259, 269 (4th Cir. 2010). Thus, the district court could consider not only the rental receipt found among A.G.'s belongings, but also the testimony that A.G. paid rent on the trailer "from time to time," the testimony that Juarez-Gomez held the lease on the trailer, and the fact that A.G. was Juarez-Gomez's son. (J.A. No. 13-4059 476.)

Given the evidence before the district court that the trailer was a drug stash house that formed the hub of a cocaine-dealing conspiracy, that Juarez-Gomez leased the trailer, that A.G. lived in the trailer, that A.G. attended drug deals with Pedro and Erasto, that A.G. assisted Pedro in the extraction of cocaine base from liquid cocaine, that A.G. was Juarez-Gomez's son, and that A.G. repeatedly paid rent on the trailer, the district court had ample evidence to conclude that Juarez-Gomez took the affirmative act of directing his minor son, A.G., to pay rent on the trailer that he had leased for use as a drug stash house. Further, given the evidence that the trailer was filled with large quantities of drugs, money, and firearms, Juarez-Gomez's act of bringing A.G. into the trailer to live

21

instead of leaving A.G. in another location "is an affirmative act that involves the minor in the offense" and constitutes more than the minor's mere presence. Mata, 624 F.3d at 176.

We therefore affirm the district court's application of the section 3B1.4 use of a minor enhancement as to Juarez-Gomez.

### C    Erasto: Possession of a Dangerous Weapon

Again, "we review the district court's sentencing procedure for abuse of discretion, and must reverse if we find error, unless we can conclude that the error was harmless." Lynn, 592 F.3d at 581. We "review the district court's legal conclusions de novo and its factual findings for clear error." Layton, 564 F.3d at 334.

Erasto challenges the district court's application of the section 2D1.1(b)(1) possession of a dangerous weapon enhancement, arguing that there is no direct evidence that he physically possessed a firearm during any drug transaction. Erasto further argues that the guns found in the trailer all belonged to Juarez-Gomez because they were found in Juarez-Gomez's bedroom.

At Erasto's sentencing, the government produced evidence that authorities found three firearms during their search of the trailer. The district court attributed those firearms to Erasto, concluding that it was reasonably foreseeable to him that

firearms would be used in the conspiracy. On appeal, Erasto acknowledges that this court has held that weapons carried by a member of a conspiracy are attributable to a co-conspirator when "'under the circumstances of the case, it was fair to say that it was reasonably foreseeable to [the defendant] that his co-participant was in possession of a firearm.'" United States v. Kimberlin, 18 F.3d 1156, 1160 (4th Cir. 1994) (quoting United States v. White, 875 F.2d 427, 433 (4th Cir. 1989)). Erasto further acknowledges that this court holds that "[a]bsent evidence of exceptional circumstances, . . . it [is] fairly inferable that a codefendant's possession of a dangerous weapon is foreseeable to a defendant with reason to believe that their collaborative criminal venture includes an exchange of controlled substances for a large amount of cash." Id. (quoting United States v. Bianco, 922 F.2d 910, 912 (1st Cir. 1991)).

The facts of this case afforded the district court, under our precedents and the Guidelines, ample evidence on which to find that the defendant's conduct merited the enhancement. As the district court noted, the commentary to the Guidelines states that "[t]he enhancement [for possession of a dangerous weapon] should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S. Sentencing Guidelines Manual § 2D1.1 cmt. n.11(A); (J.A. 159). Undisputed portions of the PSR give every

23

reason to believe that the weapons in question were connected to the conspiracy and substantive counts on which Erasto was convicted. The PSR found that Erasto was responsible for more than 8,000 grams of cocaine and 700 grams of cocaine base recovered in the form of narcotics and currency from the residence. (See J.A. 212.) Three firearms—one stolen assault rifle and two handguns—were discovered in the residence as well, including one that was in plain view. (See J.A. 201, 203, 211.) Various tools for measuring, storing, and dissolving cocaine were also present. (See J.A. 211.) The district court found that Erasto was tied to the residence through both his presence there when the police arrived as well as the existence of an energy bill for the residence in his name. (See J.A. 158.)

Erasto also appears to have been close with his co-conspirators: one was his brother, and Erasto brought the son of the third co-conspirator along with him to several drug deals. (See J.A. 211-12, 213.) The CW told the government that he had engaged in an unspecified number of drug deals with Erasto and his brother in the time leading up the arrest. (See J.A. 211-12.)

Together these facts, not objected to by Erasto, give no reason to overturn the district court's factual finding that the weapons were connected to the drug trafficking conspiracy and that this was reasonably foreseeable on the part of Erasto.

There is nothing in the record to suggest that the weapons were unconnected to the offense, and the district judge did not err when he found that the defendant was connected with the residence through his presence at the time of the search and the energy bill in his name. Defense counsel had the opportunity at sentencing to challenge Erasto's connection to the firearms beyond his objections to the PSR but stated "I don't need to be heard further on the gun." (J.A. 154.) We thus decline to disturb the court's finding that the facts of this case supported a two-level dangerous weapons enhancement under Guidelines section 2D1.1(b)(1).

### D    Assumed Error Harmlessness Review

Juarez-Gomez challenges the district court's application of the section 3B1.1(c) leadership enhancement, arguing on appeal that he performed only the functions of a street-level drug dealer, the lowest rung on a drug-conspiracy ladder. Erasto challenges the district court's application of the section 3B1.4 use of a minor enhancement, arguing on appeal that A.G.'s presence at a drug deal conducted by he and Pedro was not legally sufficient to support that enhancement.

Consistent with our circuit precedent in Savillon-Matute and Hargrove, rather than review the merits of each of these challenges, we may proceed directly to an "assumed error

25

harmlessness inquiry." Hargrove, 701 F.3d at 162. In Savillon-Matute, we held that harmless error review applies to a district court's procedural sentencing errors made during its Guidelines calculation. 636 F.3d at 123–24 (holding that "'procedural errors at sentencing . . . are routinely subject to harmlessness review'" (quoting Puckett v. United States, 556 U.S. 129, 141 (2009))). A Guidelines error is considered harmless if we determine that (1) "the district court would have reached the same result even if it had decided the guidelines issue the other way," and (2) "the sentence would be reasonable even if the guidelines issue had been decided in the defendant's favor." Savillon-Matute, 636 F.3d at 123.

In this case, the district court made it abundantly clear that it would have imposed the same sentence against both Juarez-Gomez and Erasto regardless of the advice of the Guidelines. For example, in pronouncing Juarez-Gomez's sentence, the district court stated,

> I have considered all the 3553(a) factors[,] and [in] imposing this sentence I do believe that I have properly calculated the advisory guideline range. If, however, for some reason someone were to determine that I did not, I announce an alternative variant sentence pursuant to [Keene, 470 F.3d 1347, Savillon-Matute, 636 F.3d 119, and Hargrove, 701 F.3d 156].

26

(J.A. No. 13-4059 519; see J.A. No. 12-5030 170 (making a nearly identical statement in pronouncing Erasto's sentence, quoted in full supra).)

Thus, even assuming, arguendo, that the district court erred in its application of the challenged sentencing enhancements, the first element of the assumed error harmlessness inquiry is met in each case because the district court has expressly stated in a separate and particular explanation that it would have reached the same result, specifically citing to Savillon-Matute, Hargrove, and its review of the § 3553(a) factors. We therefore proceed to the second step of the inquiry, whether the district court's sentences are substantively reasonable.

When reviewing the substantive reasonableness of a sentence, we "examine[] the totality of the circumstances to see whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in § 3553(a)." United States v. Mendoza-Mendoza, 597 F.3d 212, 216 (4th Cir. 2010). And while we presume that sentences within the advisory Guidelines range are substantively reasonable, even sentences that vary outside the Guidelines range are entitled to due deference. See United States v. Engle, 592 F.3d 495, 504 (4th Cir. 2010).

27

While Juarez-Gomez provides no argument regarding the substantive reasonableness of his sentence, Erasto argues that his sentence is substantively unreasonable because he had participated in the conspiracy for a short amount of time, the length of his Guidelines range is based primarily upon the large quantity of drugs found in the trailer, he had no serious criminal history, and he faces additional sanctions in immigration proceedings following his incarceration.

The record reflects that, in each case, the district court provided a thorough and persuasive § 3553(a) analysis, carefully considering each of the defendant's arguments. With respect to Erasto, the district court recognized its "obligation to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in the statute." (J.A. No. 12-5030 165.) The district court noted that Erasto had conspired to distribute and possess with intent to distribute large quantities of both powder cocaine and cocaine base. It considered the short length of the conspiracy and concluded that it was not particularly mitigating due to the large quantity of cocaine found in the trailer. Despite the short duration of the conspiracy, the district court concluded, "you knew who you were in business with and you were in business to make money as a drug dealer. So you then pay a price for the size of the

business you go into, and I do think you knew what you were doing." (J.A. No. 12-5030 167.)

The district court then considered Erasto's history and characteristics, including his family status and upbringing and the fact that he entered the country illegally. The district court identified the need for both individual and general deterrence, expressing concern over "the presence of such a large amount of drugs, the large amount of currency and the firearms." (J.A. No. 12-5030 168.) Based upon all of these considerations, the district court sentenced Erasto to 180 months' imprisonment.

Given the district court's thorough consideration of Erasto's arguments and individual circumstances, we do not find his sentence to be substantively unreasonable.[8]

---

[8] We conclude that the district court did not abuse its discretion by declining to consider Erasto's status as a deportable alien as a mitigating factor at sentencing. We also note that Erasto's argument that his status as a deportable alien is a mitigating factor requiring a lesser sentence has been squarely rejected in other circuits. See United States v. Thavaraja, 740 F.3d 253, 262–63 (2d Cir. 2014) (holding that in determining an appropriate sentence under § 3553(a), "a district court may[, but not must,] take into account the uncertainties presented by the prospect of removal proceedings"); United States v. Morales-Uribe, 470 F.3d 1282, 1287 (8th Cir. 2006) (vacating a sentence as unreasonable and remanding for resentencing when a district court judge considered the defendant's impending deportation as a mitigating factor and that defendant had repeatedly entered the country illegally); see also United States v. Flores-Olague, 717 F.3d 526, 535 (7th Cir. 2013) (affirming the sentencing court's consideration of (Continued)

29

With respect to Juarez-Gomez, the district court again considered all of the arguments made at sentencing and evaluated his individual history and characteristics. Among other things, the district court considered that Juarez-Gomez "gr[e]w up in poverty in Mexico" and that he has "repeatedly come to the United States illegally." (J.A. No. 13-4059 514.) The district court then recounted a "variety of crimes" Juarez-Gomez committed while in the United States, including illegal reentry following deportation, which the district court concluded "shows no respect for the law." (J.A. No. 13-4059 514.) The district court considered Juarez-Gomez's involvement of his minor son,

---

defendant's status as a deportable alien as an aggravating factor under § 3553(a)); United States v. Petrus, 588 F.3d 347, 356 (7th Cir. 2009) (holding that, dependent upon the circumstances of the case, a defendant's deportability could be viewed as either a mitigating or an aggravating factor). And several more circuits, including this one, have rejected such an argument in unpublished decisions. See United States v. Gutierrez, 506 F. App'x 714, 722 (10th Cir. 2012) (unpublished) (holding that "deportable alien status is not a ground for departing downward"); United States v. Salguero-Ortiz, 483 F. App'x 858, 864 (4th Cir. 2012) (unpublished) (affirming a defendant's sentence when the district court did not sua sponte consider his status as a deportable alien at sentencing); United States v. Kiss-Velasquez, 449 F. App'x 634, 637 (9th Cir. 2011) (unpublished) (holding that a district court "did not err in concluding that [the defendant] was not entitled to a downward departure due to his status as an alien subject to removal"); United States v. Arroyo Mojica, 131 F. App'x 80, 82 (9th Cir. 2005) (unpublished) (vacating a defendant's sentence and remanding for resentencing when the district court considered the defendant's status as a deportable alien as a mitigating factor justifying a downward departure).

A.G., in the drug conspiracy to be an aggravating factor warranting a higher sentence and distinguished him from Pedro and Erasto based upon his aggravated criminal history. Further citing the need for both individual and general deterrence, the district court sentenced Juarez-Gomez to concurrent sentences of 390 months' imprisonment on Counts One and Six and 240 months' imprisonment on Counts Two through Five.

Again, based upon the district court's thorough consideration of the totality of Juarez-Gomez's circumstances as well as our deferential standard of review and Juarez-Gomez's failure to provide argument regarding substantive reasonableness on appeal, we find no basis upon which to reverse his sentence.

Erasto makes one additional argument that our precedent in Savillon-Matute and Hargrove should apply only in cases where a district court imposes a sentence above the Guidelines range determined at sentencing. While both Savillon-Matute[9] and Hargrove[10] did involve consideration of sentences above the

---

[9] In Savillon-Matute, the district court determined that the defendant's advisory Guidelines range was 12 to 18 months' imprisonment. Due to the seriousness of the defendant's criminal history, however, the district court ultimately sentenced the defendant to 36 months' imprisonment, announcing a variant sentence pursuant to § 3553(a).

[10] In Hargrove, the district court determined that the defendant's advisory Guidelines range was 41-51 months' imprisonment. Based upon its consideration of the factors in § 3553(a), the district court ultimately sentenced the defendant to 60 months' imprisonment.

district court's determined Guidelines range, harmless error review can apply to all claims of procedural error at sentencing. As clearly stated by the Supreme Court in Puckett, and quoted by this court in Savillon-Matute, "procedural errors at sentencing . . . are routinely subject to harmlessness review." Puckett, 556 U.S. at 141; Savillon-Matute, 636 F.3d at 123; see United States v. Zabielski, 711 F.3d 381, 387 (3d Cir. 2013) (applying harmlessness review to a below-Guidelines sentence); Keene, 470 F.3d at 1350 (applying harmlessness review to a within-Guidelines sentence). Here, the district court explicitly made a separate and particular statement of its consideration of the § 3553(a) factors in "announcing an alternate variant sentence."

Moreover, in Keene, the Eleventh Circuit case establishing the standards for "assumed error harmlessness review" that we adopted in Savillon-Matute, the court reviewed and affirmed a sentence that was within the Guidelines range determined by the district court at sentencing, but would have been above the Guidelines range advocated by the defendant on appeal. At sentencing, the district court concluded that the defendant's advisory Guidelines range was 100 to 125 months' imprisonment, based in part on its application of a sentencing enhancement for making death threats under Guidelines section 2B3.1(b)(2)(F). The defendant argued that the district court had wrongly applied

32

the death threat enhancement and asserted that his Guidelines range should have been 84 to 105 months' imprisonment. The district court ultimately rejected the defendant's arguments and sentenced him to 120 months' imprisonment. The district court stated for the record that it would have imposed the same sentence pursuant to § 3553(a) even if it had decided the Guidelines issue in favor of the defendant.

On appeal, the Eleventh Circuit assumed that the district court had incorrectly determined the advisory Guidelines range, and reviewed that assumed error for harmlessness. The court thus treated the sentence imposed as an above-Guidelines sentence and considered whether that sentence was reasonable. The Eleventh Circuit concluded that the sentence was supported by the district court's analysis of the § 3553(a) factors regardless of the advice of the Guidelines. The court reasoned that "it would make no sense to set aside [a] reasonable sentence and send the case back to the district court since it has already told us that it would impose exactly the same sentence, a sentence we would be compelled to affirm." 470 F.3d at 1350.

Our decision in this case is in complete parity with Keene. As in Keene, the district court sentenced the defendants to terms of imprisonment that were within the Guidelines range established at sentencing. And also, like Keene, if the Guidelines issues asserted by the defendants on appeal had been

33

decided in their favor, their sentences would be above-Guidelines sentences. Because the district court has explicitly stated that it would have imposed the same sentences regardless of the advice of the Guidelines, however, we can affirm as long as those sentences are reasonable. See Hargrove, 701 F.3d at 164-65; Savillon-Matute, 636 F.3d at 124; Keene, 470 F.3d at 1348-50. As described above, the district court supported its sentences with a separate and particular analysis under § 3553(a), and we conclude that the district court's ultimate sentences were reasonable under that analysis. We therefore affirm the district court's sentencing decisions and conclude that any assumed errors in the district court's application of the section 3B1.1(c) leadership enhancement to Juarez-Gomez or the section 3B1.4 use of a minor enhancement to Erasto were harmless in this case.

III

For the foregoing reasons, we affirm the district court's judgments.

AFFIRMED

34

GREGORY, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion as to the sufficiency of evidence for Juarez-Gomez's conviction and the enhancement for firearm possession.[1]  I dissent from the disposition of the remaining sentencing enhancement challenges: use of a minor, U.S.S.G. § 3B1.4, and the majority's harmless error analysis.

I.

I would reverse the district court's enhancement of Juarez-Gomez's sentence for the use of a minor.  The Sentencing Guidelines impose a two-level enhancement where a defendant "used or attempted to use" a minor in committing the offense of conviction or in avoiding detection thereof.  U.S.S.G. § 3B1.4. Congress defined "use" in a manner that encompasses a host of actions ranging from direction to training to solicitation. U.S.S.G. § 3B1.4 cmt. n. 1.  Based on this broad definition, the

---

[1] I also concur in the conclusion that the district court did not abuse its discretion in refusing to depart downward on the basis of Erasto's status as a deportable alien.  This Court has long recognized that we lack jurisdiction to review a refusal to depart downward so long as the district court recognized its ability to do so.  See, e.g., United States v. Brewer, 520 F.3d 367, 371 (4th Cir. 2008).  The district court recognized this discretion and declined to exercise it.  For this reason alone, I find no abuse of discretion, see United States v. Olivares, 473 F.3d 1224, 1231 (D.C. Cir. 2006), although I agree that a defendant's status as a deportable alien does not mandate downward departure.

majority concludes that the enhancement is appropriate based on the affirmative acts of (1) directing A.G. to pay rent and (2) "bringing A.G. into the trailer to live instead of leaving A.G. in another location." Maj. Op. at 21-22. Whether a defendant "uses" a minor under the Guidelines is a legal conclusion reviewed de novo. United States v. Feaster, 43 F. App'x 628, 632 (4th Cir. 2002) (citing United States v. McClain, 252 F.3d 1279, 1284 (11th Cir. 2001)); United States v. Powell, 732 F.3d 361, 380 (5th Cir. 2013).

As elastic as the Guidelines definition may be, I find that the majority's conclusion stretches "use" beyond its limits. Absent other evidence, a minor's mere presence does not warrant enhancement under § 3B1.4. See, e.g., United States v. Molina, 469 F.3d 408, 414 (5th Cir. 2006). The majority concludes that there was more than mere presence, such that the use of a minor enhancement is appropriate as to Juarez-Gomez. Maj. Op. at 20. I find that to the extent that there is something more than presence, those acts do not fall within the Guidelines definition. United States v. Mata, which the majority opinion cites, provides a clear line of demarcation between that case and the facts now before us.[2] In Mata, the court explained that

---

[2] Two other cases referenced in the majority opinion are also distinguishable. In United States v. Taber, the fact that the defendant drove the minor to the robbery location was viewed (Continued)

presence could sufficiently constitute an affirmative act where the minor's presence served as a decoy or was otherwise instrumental in evading detection of criminal activity. 624 F.3d 170, 176 (5th Cir. 2010). Discovering such connection "requires a purpose driven inquiry." United States v. Powell, 732 F.3d 361, 380 (5th Cir. 2013). Juarez-Gomez's actions cited by the majority fall short of being acts intended to "commit the offense or assist in avoiding detection of, or apprehension for, the offense." U.S.S.G. § 3B1.4.

### A.

On this record, paying rent for the trailer was neither criminal activity nor a means of avoiding detection. Without any evidence that submitting the monthly rent for the place where he and his father lived is a criminal act, I do not see

---

in connection with the fact that the minor broke into a building and stole firearms, a patently affirmative criminal act, and that the defendant acted as a lookout while the minor stole weapons. 497 F.3d 1177, 1181 (11th Cir. 2007). The record does not demonstrate the same confluence of criminal activity involving Juarez-Gomez and A.G.

United States v. Voegtlin noted that enhancement may be proper where a minor is asked to accompany a defendant who commits a crime. 437 F.3d 741, 747 (8th Cir. 2006). However, the case upon which Voegtlin relied for this rule involved a minor asked to accompany the defendant to a crime because the defendant would not have had the courage to commit the crime without the minor present. See United States v. Paine, 407 F.3d 958, 965 (8th Cir. 2005). Again, nothing in this record crafts an analogous situation whereby Juarez-Gomez needed A.G. in order to sell drugs.

how A.G.'s act of paying the rent amounts to committing the offense of conspiracy to distribute. Were that the case, then all parents who ask their children to drop off a rent payment for a residence that is used to engage in criminal activity would be subject to a two-level enhancement. Furthermore, nothing in the record so much as hints at how A.G. paying the rent, rather than Juarez-Gomez, somehow kept the landlord or anyone else from discovering criminal activity in the trailer.[3] Without a showing that paying rent for A.G.'s residence was criminal or linked to evasion from authorities, merely paying rent cannot amount to an affirmative act involving the minor in the offense of conviction.

In much the same way, I also disagree that the enhancement applies on the ground that Juarez-Gomez brought A.G. to live in the trailer rather than leave A.G. elsewhere. The majority's reliance on Mata for this conclusion is misplaced. In Mata, the court explicitly found a connection between the minors' presence and a plan for evading detection. See Mata, 624 F.3d at 177 (the presence of the minors in the car was intended to "give the appearance that the group was traveling as a family unit and to

_____

[3] The landlord stated that he collected rent from A.G. from time to time. This does not suggest that A.G. exclusively, as opposed to intermittently, paid the rent. Thus, there is no inference that A.G. paying rent was a method for Juarez-Gomez to avoid being known by the landlord or anyone else.

38

reduce the likelihood of coming under suspicion for being engaged in criminal conduct"). The court cited evidence demonstrating that the defendant, who planned to use her children to avoid detection from law enforcement, "could have avoided bringing her children with her by leaving them under the care of her friend who, like Mata, lived in San Antonio." Mata, 624 F.3d at 177. Here, there is no proof that A.G.'s presence at the trailer served as an explanation or cover for criminal activity. See Molina, 469 F.3d at 413-14 (enhancement inappropriate where no evidence in drug conspiracy conviction could show that the defendant "believed that his seventeen-year-old girlfriend's presence in the vehicle during the drug run would assist in avoiding detection"). Furthermore, no evidence demonstrates that Juarez-Gomez could have left his son to live with someone, whether in the same city or elsewhere.

The Fifth Circuit was careful to limit its decision in order to ensure that § 3B1.4 was not applied to "every defendant who brings a minor child along while [engaging in criminal conduct] is subject to" the § 3B1.4 enhancement. Mata, 624 F.3d at 176. By contrast, the majority opinion lays the very trap that the Fifth Circuit refused to set. The facts in this case do not show that A.G. paying rent or living with Juarez-Gomez was criminal or calculated to elude authorities. By applying

39

§ 3B1.4 regardless, the majority expands the enhancement beyond its language.

B.

A.G.'s presence at drug deals with Pedro and Erasto involve some additional facts, yet not enough for me to agree that the use of a minor enhancement was appropriate for Juarez-Gomez. The confidential witness explained that A.G. was present at multiple drug deals with both Pedro and Erasto, and that another deal where only Pedro and A.G. were present involved A.G. assisting Pedro in cooking cocaine base. No facts demonstrate that Juarez-Gomez instructed A.G. to join Pedro and Erasto, or that he instructed A.G. to engage in criminal activity, e.g. cooking cocaine.[4]

To the extent that the majority implicitly relies upon A.G.'s acts in connection with Pedro and Erasto's activities, see Maj. Op. at 21, enhancement could only be proper if it was reasonably foreseeable that Pedro and Erasto would involve A.G. in criminal activity. The majority declined to take a position on this issue, having otherwise found sufficient proof of an affirmative act within the definition of § 3B1.4. See Maj. Op.

---

[4] At oral argument, the government averred that having A.G. in the trailer where individuals were storing and cooking drugs equates to training and encouragement. Taken to its logical conclusion, presence at any criminal activity would be construed as encouraging a minor to engage in the same activity, rendering "mere presence" a mere theory.

at 19 n. 8.  I address this issue only to make two brief points.

First, with respect to those deals involving both Erasto and

Pedro, no evidence shows that A.G.'s presence in any way

assisted the commission of the drug deals or diminished the

likelihood of detecting criminal activity.[5]  Cf. Mata, 624 F.3d

at 176-77.  Second, the deal where A.G. assisted Pedro in

cooking cocaine base undoubtedly presents a use of minor within

the Guidelines definition.  However, I would conclude that

Pedro's conduct, even if reasonably foreseeable, cannot trigger

the use of a minor enhancement as to Juarez-Gomez.  See United

States v. Pojilenko, 416 F.3d 243 (3d Cir. 2005) (co-

conspirator's reasonably foreseeable use of a minor cannot apply

to other conspiracy members for the purpose of applying

§ 3B1.4).  I believe the principles recognized in our United

States v. Moore decision apply equally to § 3B1.4.  See 29 F.3d

175 (4th Cir. 1994).  Moore looked to the structure and

defendant-specific language of role in the offense enhancements

under chapter three and held that the Guidelines require a

finding that the defendant, not any co-conspirators, engage in

the proscribed behavior.  Id.; see also Pojilenko, 416 F.3d at

248-249 (applying Moore's reasoning to § 3B1.4).

---

[5] Although the majority does not reach the issue, I would
find § 3B1.4 inapplicable to Erasto for this same reason.

41

For these reasons, I would find that neither the conduct of Juarez-Gomez nor that of his co-conspirators supports a § 3B1.4 enhancement for Juarez-Gomez.

## II.

I further disagree that, even assuming the district court committed error in applying the leadership enhancement to Juarez-Gomez and the use of a minor enhancement to Erasto, the errors were harmless.

In order to avoid remanding a sentence that we would otherwise affirm despite a procedural error, we conduct an "assumed error harmlessness inquiry" consisting of two steps. United States v. Hargrove, 701 F.3d 156, 162-63 (4th Cir. 2012); see also United States v. Savillon-Matute, 636 F.3d 119, 123-24 (4th Cir. 2011). First, this Court must have the "knowledge that the district court would have reached the same result even if it had decided the [G]uidelines issue the other way." Savillon-Matute, 636 F.3d at 123. Second, this Court must determine that the imposed sentence would be reasonable even after resolving the procedural error in the defendant's favor. Id. Only where the Court is "certain" of these two factors will an error be deemed harmless. United States v. Gomez, 690 F.3d 194, 203 (4th Cir. 2012).

42

I am not certain that we have the requisite knowledge that the district court would have reached the same result absent any error in calculating the Guidelines range. To be sure, the district court stated that it would have imposed the same sentence even if the Guidelines calculations were erroneous. This explicit statement presents a different circumstance from Savillon-Matute, Hargrove, and our recent decision in United States v. Montes-Flores, 736 F.3d 357 (4th Cir. 2013), where the district courts made no such statement. Even so, I do not believe that a simple statement that the court would have imposed the same sentence is sufficient, at least where the imposed sentence exceeds what would have been the Guidelines range absent the procedural error.[6] The district court's explanation fails to distinguish its reasons for a within-Guidelines sentence from those for an above-Guidelines sentence, and thus fails to provide the necessary certainty to know it would have imposed the same sentence. See United States v.

---

[6] If we assume the court erred in applying the use of a minor enhancement to Erasto, then his 180-month sentence exceeds what would be a Guidelines range of 135-168 months.

If we likewise assume the court erred in applying both the use of a minor and the leadership enhancements to Juarez-Gomez, his 390-month sentence also exceeds what would be a Guidelines range of 262-327 months. This would result from a four-level reduction--two levels for each enhancement. If we only assume error as to the leadership enhancement, since the majority affirmed the use of a minor enhancement, then the two-level reduction would result in a range of 320-405 months.

43

*Zabielski*, 711 F.3d 381, 389 (3d Cir. 2013) ("Though probative of harmless error, [a statement that the court would have imposed the same sentence] will not always suffice to show that an error in calculating the Guidelines range is harmless; indeed, a district court still must explain its reasons for imposing the sentence under either Guidelines range.").

In reviewing above-Guidelines sentences, without the harmless error analysis, we would require the district court to "explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate." *United States v. Gall*, 552 U.S. 38, 46 (2007). The majority is content with considering harmless what would otherwise require a separate and particular explanation for a variance. To allow what is, as a matter of analytical fiction, an above-Guidelines sentence without the explanation normally required for such sentences fails to comport with the need "to allow for meaningful appellate review and to promote the perception of fair justice." *Id.* at 50. Nothing could be less meaningful than labeling an error harmless so long as a district court states it would impose the same sentence in the event it erred, without also "thorough[ly] expla[ining]" *why* it would do so. *Zabielski*, 711 F.3d at 389. The exception has now swallowed the rule.

Our good colleague, who previously authored *Savillon-Matute*, recognized that harmlessness is difficult to prove where

44

a district court calculates a guidelines range and sentences a defendant within that range, for "it is logical to assume that if a district court is content to sentence within whatever the guidelines range happens to be, then a lower range would lead to a sentence within that lower range." Montes-Flores, 736 F.3d at 372 (Shedd, J., dissenting). It would seem equally logical that if the ranges for Erasto and Juarez-Gomez were erroneously calculated, the district court would have imposed a sentence within the new ranges just as it imposed sentences within the erroneous ranges. We cannot be certain that it would have varied upward without some appropriate and stated justification for doing so.

Within-Guidelines sentences, the scenario Judge Shedd referenced in Montes-Flores, appear in the majority of convictions. Undoubtedly, some cases will also involve reprehensible behavior and criminal history that may warrant punishment beyond what the Guidelines recommend. I do not doubt a district court's power to impose such sentences. I only call for what would be required if we were to apply Gall and consider procedural reasonableness: a "justification for an above-Guidelines sentence." Montes-Flores, 736 F.3d at 371 (emphasis added). If the standard for harmlessness truly is "a high bar," id., we should not be so forgiving as to find harmlessness without the explanation that would be otherwise required, see,

45

e.g., United States v. King, 673 F.3d 274, 283 (4th Cir. 2012) (appellate review must ensure that district courts "adequately explain . . . any deviation from the Guidelines range"). Only with the assistance of such an explanation or justification may we then conduct a meaningful review.

The absence of such justification for the alternative sentence cannot be more at odds with the perception of fair justice. The majority perceives the district court as specifically citing, in a "separate and particular explanation" for its alternative sentence, Maj. Op. at 26, the § 3553(a) factors. In reality, that "separate and particular explanation" was a single sentence, in which the district court simply referenced our harmless error precedent and its § 3553(a) analysis, which was devoid of any indication that an upward variance was necessary to impose an appropriate sentence. A court must provide more than just the § 3553(a) factors as a reason for varying upward, as those are required for every sentencing. Montes-Flores, 736 F.3d at 371. Absent any stated reason for varying upward where the court was otherwise satisfied to impose a sentence in the middle of the Guidelines range, I do not find that the district court's § 3553(a) review would justify an upward variance. While district courts need not employ any particular verbiage to justify an above-Guidelines sentence, the imposition of an alternative sentence

46

demands "a thorough explanation" that "can help us identify when an erroneous Guidelines calculation had no effect on the final sentencing determination." Zabielski, 711 F.3d at 389. To accept the perfunctory reasoning offered here for an alternative, variant sentence would be to value form over the substance Gall requires.

The evolution of our harmless error jurisprudence has reached the point where any procedural error may be ignored simply because the district court has asked us to ignore it. In other words, so long as the court announces, without any explanation as to why, that it would impose the same sentence, the court may err with respect to any number of enhancements or calculations. More to the point, a defendant may be forced to suffer the court's errors without a chance at meaningful review. Gall is essentially an academic exercise in this circuit now, never to be put to practical use if district courts follow our encouragement to announce alternative, variant sentences.[7] If

---

[7] While this Court has reviewed alternative sentences for more than twenty years, we recently began encouraging the imposition of alternative sentences in light of uncertainties eventually resolved by United States v. Booker. See United States v. Hammoud, 378 F.3d 426 (4th Cir. 2004), vacated 543 U.S. 1097 (2005); see also Montes-Flores, 736 F.3d at 374 & n. 4 (Shedd, J., dissenting). Perhaps this concept of alternative sentences serves a purpose in extraordinary circumstances of constitutional importance, such as that time period where we questioned whether the Guidelines were mandatory or advisory. See id. at 426; see also United States v. Alvarado Perez, 609 (Continued)

47

the majority wishes to abdicate its responsibility to meaningfully review sentences for procedural error, the least it can do is acknowledge that it has placed <u>Gall</u> in mothballs, available only to review those sentences where a district court fails to cover its mistakes with a few magic words.

The majority upholds the challenged sentences because they are accompanied by a cursory statement that essentially renders procedural mistakes irrelevant. This is perhaps the most troubling aspect of the majority's conclusion: the combination of the district court's statement and a one-sentence argument at the end of the government's brief is a sufficient basis for this Court's refusal to review the propriety of a sentencing enhancement. As an initial matter, this approach deprives us of the opportunity to address the applicability of sentencing enhancements. More importantly, the practical effect of this conclusion is the creation of a mechanism whereby district courts may impose one-size-fits-all sentences that appellate courts would refrain from meaningfully reviewing. Courts could apply any number of enhancements to justify reaching the sentence they desire, then use this Court's harmless error

---

F.3d 609, 619 (4th Cir. 2010) (noting the "limited context" in which this Court encouraged alternate sentences). However, absent legal uncertainties of the magnitude present in the time between <u>Blakely v. Washington</u> and <u>Booker</u>, I would not encourage alternative sentences.

jurisprudence to prompt us to uphold a sentence that otherwise lacks a sufficient justification. The notion of consistent sentences for similarly situated defendants disappears where errors regarding conduct and enhancements--errors which would make defendants dissimilar--are swept under the rug of harmlessness.

For these reasons, I remain unconvinced we have the requisite knowledge for harmless error where, as here, the district court merely announces an alternative variant sentence, equal to the initial within-Guidelines sentence, without a thorough explanation demonstrating that an error in calculating the sentencing range had no bearing on the imposed sentence. This would justify what would be an upward deviation from a properly calculated Guidelines range. Therefore, I respectfully dissent from the majority's harmless error analysis.[8]

---

[8] I would further find that the application of the remaining enhancements were erroneous and remand for resentencing. I would find that the use of a minor enhancement does not apply to Erasto because the evidence does not show anything more than A.G.'s mere presence at drug deals involving Erasto. See ante at 41 & n. 4. I would also find that the leadership enhancement inapplicable to Juarez-Gomez because A.G. paying rent for the place A.G. lives is not a criminal activity which could show that Juarez-Gomez directed or supervised an act by A.G. that was part of the conspiracy to distribute.