**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-4207**

---

UNITED STATES OF AMERICA,

Appellee,

v.

TYZHEEM KWAZHON NIXON,

Appellant.

---

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington.  James C. Dever, III, District Judge.  (7:21-cr-00104-D-1)

---

Argued:  October 31, 2024                           Decided:  March 10, 2025

---

Before GREGORY, WYNN, and HARRIS, Circuit Judges.

---

Vacated and remanded with instructions by published opinion.  Judge Gregory wrote the opinion, in which Judge Wynn joined.  Judge Harris wrote a dissenting opinion.

---

**ARGUED:**  Sean Paul Vitrano, VITRANO LAW OFFICES, PLLC, Wake Forest, North Carolina, for Appellant.  Karen Kiley Haughton, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:**  Michael F. Easley, Jr., United States Attorney, David A. Bragdon, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

GREGORY, Circuit Judge:

Tyzeem Kwazhon Nixon pleaded guilty to one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924. While incarcerated and awaiting sentencing, he committed several acts of violence, including multiple stabbings. The district court sentenced Nixon to more than double the Sentencing Guidelines range for his felon in possession charge, relying almost entirely on Nixon's violent acts while awaiting sentencing to justify the upward departure. The court below also disregarded a report from an unrebutted, qualified medical expert that found that Nixon's violent conduct was the result of his mental health condition and that, if treated, Nixon would pose little continued threat to society.

Our Framers were skeptical of the government's commitment to the procedural rights of the accused—and rightly so. As such, they placed in our Constitution certain inalienable guarantees for criminal defendants, chief among them the right to a trial by a fair and impartial jury. The case before us involves a means to circumvent these constitutional rights through the sentencing process, as Nixon's sentence was more than doubled based on unrelated, subsequent conduct that could have been—but was not— charged separately.

On review, we find that the district court's sentence in this case was procedurally unreasonable. The district court improperly relied on dissimilar conduct in departing to a higher criminal history category and failed to give proper consideration to intervening categories and offense levels, as required by the Sentencing Guidelines. We also find that the district court's rejection of expert testimony, without any counterevidence or basis for

2

doing so, was clearly erroneous. Lastly, we find that the procedural errors in this case were not harmless, as Nixon's sentence of more than twice the proper Guidelines range is unjustified by the totality of the circumstances in this case. We therefore vacate the sentence and remand for resentencing in accordance with this opinion.

I.

Nixon was born in 1995 in Wilmington, North Carolina. J.A. 109. With his father in and out of prison, he and his two siblings were essentially raised by a single mother, who was only seventeen when she gave birth to Nixon. *Id.* Nixon described the north side of Wilmington as a "rough and violent neighborhood," and recalled moving several times during childhood. *Id.* Nixon spoke highly of his mother's attempts to care for him and his siblings, but Child Protective Services conducted several investigations of that care throughout his childhood. All three investigations involved allegations of physical abuse of Nixon. J.A. 118–32.

Nixon's early education was interrupted frequently, both due to his frequent moves and the development of mental health issues. He was placed in "Behaviorally and Emotionally Disturbed classes" in the fourth and fifth grades, J.A. 110, and reported feelings of depression, anxiety, anger, and sadness from a young age, *id.* He was diagnosed with Attention-Deficit/Hyperactivity Disorder ("ADHD") and began using alcohol and other drugs to "cope with the stupid stuff that was happening." *Id.* This included using marijuana from age 10, and Phencyclidine ("PCP") at age 14. *Id.*

3

Nixon first encountered the criminal justice system at fourteen, spending roughly a year and a half in a youth detention center before being released at the age of seventeen. J.A. 111. He has since been in and out of incarceration. Nixon reported spending four months in solitary confinement as a teenager, with his longest period as an adult being eight continuous months. J.A. 95. Nixon also witnessed significant violence while in custody, including seeing an inmate hang himself. *Id.*

At the same time Nixon was first incarcerated, he began receiving a variety of mental health medications. J.A. 110 ("I've been on so many . . . I can't remember them all."). These medications included antidepressants and sleep aids, but not mood stabilizers. J.A. 84; *see also* J.A. 134–35, 140–47. During his most recent stint in prison, Nixon sought out additional mental health treatment, but prison officials repeatedly denied his requests until the very end of his sentence. J.A. 136–39. For a brief period before his release, Nixon received mood stabilizing medication and incurred zero disciplinary violations during that time. J.A. 143; *see also* J.A. 140–42. However, that treatment abruptly ended upon his release. While in custody for this case, Nixon has again sought improved mental health treatment. J.A. 84. To this day, Nixon reports "hav[ing] a bad temper" and significant mood swings, stating: "sometimes I am down and then sometimes I can't sleep . . . my mind be going really fast." J.A. 110.

While Nixon was awaiting sentencing for the offense at issue, the Office of the Federal Public Defender retained a psychiatrist, Dr. Reem Utterback, to evaluate Nixon and determine a proper treatment plan. Dr. Utterback conducted a forensic psychiatric evaluation and determined that Nixon suffers from Bipolar I disorder (severe, with

4

psychotic features), Post Traumatic Stress Disorder (severe), and substance abuse disorder (severe). J.A. 113–17. Dr. Utterback explained that "[p]eople with bipolar disorder experience intense emotional states that typically occur during distinct periods of days to weeks, called mood episodes" that can be either "manic" or "depressive" or mixed. J.A. 113–14. These symptoms are often misdiagnosed as ADHD in children, leading many to not receive appropriate medications until their twenties. J.A. 114. These emotional swings encourage "[e]xcessive involvement in activities that have a high potential for painful consequences" and present a "significantly increased risk for violence, especially when not treated." J.A. 113–14. As Dr. Utterback explained,

> Bipolar patients are prone to agitation that can result in impulsive aggression during manic and mixed episodes. Impulsive aggression (as opposed to premeditated aggression) is a response to a perceived threat (the fight in fight-or-flight). Mania in particular tends to trigger aggressive emotions and anger. The racing thoughts and high energy levels may leave the individual feeling angry, irritable, and frustrated. Those angry emotions in turn, can cause aggressive and inappropriate behaviors. When things don't go the way the manic person envisions, or if someone tries to rein in a manic person, the individual may lash out. The depressed states in bipolar disorder, however, can involve intense dysphoria with agitation and irritability, which can also increase the risk of violent behavior. *These behaviors are outside of the person's control*.

*Id*. (emphasis added). Dr. Utterback concluded that, "[w]hile manic, [Nixon] is irrational, irritable, belligerent, grandiose, and confrontational. A person in the throes of a manic episode, can be aggressive, impulsive, short-sighted in his/her decision-making processes, and does not have the rational ability to use proportional or appropriate future orientation in their decision-making. A manic person is unable to fully comprehend the consequences of their actions." *Id*. As a result, she opined, "[i]t is of paramount importance that [Nixon]

5

be medicated with a mood stabilizer to target the manic and depressive symptoms, instead of being placed on antidepressants alone." J.A. 116. In Dr. Utterback's view, Nixon's violent and erratic behavior, discussed more below, can be explained by his untreated mental health conditions. J.A. 114 ("[Nixon] incurred several infractions during incarceration. These infractions occurred, more likely than not, as a result of his untreated bipolar disorder.").

## II.

In December 2020, Nixon had "recently been released from the North Carolina Department of Public Safety and was believed to have removed his ankle monitor." J.A. 80. The United States Marshals Service ("USMS") received information of Nixon's location at an apartment complex. *Id.* A deputy responded and observed Nixon in his vehicle, reaching down into the passenger side door. *Id.* A search of the vehicle resulted in the recovery of a loaded handgun with a large capacity magazine in the passenger side door, and police found a small amount of marijuana on Nixon. *Id.* The firearm was found to have belonged to a victim of a recent shooting. *Id.* Nixon stated that he found the firearm while walking but could not recall where. *Id.* During an interview with police, he stated that he had schizophrenia with ten personalities, and he ended the conversation. *Id.*

Nixon was charged and detained pre-trial. In September 2022, Nixon pleaded guilty without a plea agreement to one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924. J.A. 79.

6

The probation officer prepared a presentence report ("PSR"), which recommended against a downward adjustment for acceptance of responsibility due to Nixon's "continued criminal conduct post-arraignment." J.A. 80. The PSR outlined that conduct:

> (1) on August 10, 2021, at the Pasquotank Correctional Institution in North Carolina, Nixon and several other inmates assaulted an inmate. The victim suffered approximately 18 stab wounds and was transported to the hospital;
>
> (2) on August 25, 2022, at the Piedmont Regional Jail in Virginia, Nixon joined a fight between two inmates. Nixon assaulted one of the inmates with a sharpened instrument and stabbed him in the back of the head. The victim was taken to the hospital with approximately 19 stab wounds;
>
> (3) on August 26, 2022, correctional officers conducted a shakedown of Nixon's cell. Nixon refused commands and was pepper sprayed and restrained. A sharpened nail attached to a string was found in the search of Nixon's cell;
>
> (4) on October 17, 2022, at the Bladen County Detention Center in North Carolina, Nixon requested soap from a correctional officer, but was refused. Nixon then began screaming that he would "whip [the officer's] female ass;" and
>
> (5) on December 18, 2022, at the Bladen County Detention Center, Nixon engaged in a fight with another inmate. Nixon's cellmate joined the fight, and Nixon was seen holding "a homemade weapon." Nixon stabbed the victim multiple times. A correctional officer received minor cuts on his neck and hand when breaking up the fight.

J.A. 79–82. The probation officer calculated an offense level of 20 and a criminal history category of III,[1] yielding a sentencing range of 41 to 51 months in prison. J.A. 86.

---

[1] The PSR calculated an initial "criminal history score of 3" but added two points because Nixon committed the "the instant offense while under a criminal justice sentence," pursuant to U.S.S.G. § 4A1.1(d) (2021). After Nixon's sentencing, § 4A1.1(d) (now codified at § 4A1.1(e)) was retroactively amended to (1) only award one additional point for committing an offense while on probation for a prior offense and (2) only applies if a defendant has a criminal history score of at least seven before the extra point. *See United States v. Turner*, 122 F.4th 511, 521 n.6 (4th Cir. 2024); U.S.S.G. § 1B1.10(d)–(e) (Continued)

The government moved for an upward departure, arguing that a sentence of at least 120 months was necessary to properly account for Nixon's criminal history and to deter his recidivism. J.A. 39–53. The government noted the above incidents and mentioned two additional incidents occurring after the filing of the PSR, including Nixon twice more being found with metal rods in his rectum after denying that he had a weapon on his person. J.A. 44–45. The government stated that Nixon also told a detention officer that he was going to cut that officer's head off one day, claimed to have blood on his shoes from stabbing another inmate, and told an officer that "all he could get was 120 months and [the correctional officers] . . . couldn't do anything else to him." *Id.*; J.A. 176. These incidents, the government argued, were not included in Nixon's criminal history score, rendering category III inadequate. J.A. 40–42. Nixon countered with Dr. Utterback's report, noting that his bipolar disorder has gone untreated and that he is "not able . . . to control his behavior and never has been, because though he has asked for the mental health treatment, he has not until January of this year been properly diagnosed, and he has to date not been properly treated." J.A. 190.

The district court granted the government's motion for an upward departure under Sentencing Guidelines Manual § 4A1.3 and adjusted Nixon's criminal history to category VI and the offense level to 24. J.A. 201–02. This resulted in a new Guidelines range of 100–125 months, subject to a statutory cap of 120 months. *Id.* The court listed Nixon's felony

---

(providing for retroactive effect). While we express no opinion on the application of this amendment, we note that a criminal history score of three would place Nixon in category II, yielding a sentencing range of 37–46 months.

conviction, infractions while in state custody, supervised release violations, new criminal conduct, and repeated violent acts while incarcerated, including those in the weeks leading up to the sentencing hearing, as justifications for the departure. J.A. 192–200. The court rejected Dr. Utterback's conclusion and declined an opportunity to hear from her, instead stating: "I don't need to hear from her. I read her report. I don't find it credible." J.A. 192.

> The court's full analysis on the upward departure is below:

> I think it does take cunning and planning on his part as reflected in the decision, when you're going to the Terry Sanford Building and you're not sure whether you're going to go back, to put a shank in your rectum, where only a week before you had had a shakedown at the same facility and a shank had been confiscated.

> And so I do think that under 4A1.3 it is appropriate to upwardly depart because I think Mr. Nixon's likelihood of recidivism is as close to 100 percent as it can be. And, again, as the — as the comment note section addresses, the diagnosis can't account for everything, but the defendant is a person who is 27, and the commentary talks about cases of younger defendants who were in their early 20s or younger who may have received repeated lenient treatment.

> Obviously, he hasn't been criminally prosecuted for a lot of this activity and he could have been. But I think it would be a dereliction on my part to ignore it for purposes of analyzing his inadequate criminal history. And so I think his criminal history category of III is woefully inadequate.

> Under the case law associated with upward departures, the Court having found the need to upwardly depart, has assessed the criminal history categories associated with a sentencing table and in accordance with Fourth Circuit cases, the Court is instructed to move incrementally in assessing what would ultimately be, in the Court's view, as the appropriate criminal history category.

> Obviously, I find III to be woefully inadequate, so I move to the right towards criminal history category VI. Having got to criminal history category VI and offense level 20, the Fourth Circuit has instructed that if I find that advisory guideline range to be insufficient, I'm then to move down the table to criminal history category VI.

9

> And having done that and evaluated these multiple instances of violence and discounted the attempted explanation by the psychiatrist, while recognizing that he has — even if I accept what she says about his conditions, I don't accept the causal connection for all of his criminal behavior, including the possession of a firearm and all of these multiple instances of violence and thinking about his criminal history.

> And so I move at this point to offense level 24 and a criminal history category of VI, so his new advisory guideline range is 100 to 125 months. The top end of that guideline then becomes 120 by virtue of the stat max, so his new advisory guideline range is 100 to 120 months.

J.A. 200–02. Notably, the court never mentions categories IV or V for criminal history, going straight to category VI and offense level 24 without further explanation.

The court also declined to apply a reduction for acceptance of responsibility, noting the August 25 assault with a sharpened instrument, the October 17 verbal altercation with a correctional officer, and the December 18 assault with a homemade weapon. J.A. 164–66. The district court similarly refused to credit Dr. Utterback's report in the acceptance of responsibility analysis. J.A. 164.

The court then heard arguments as to the proper sentence within the Guidelines range set by category VI and offense level 24. After hearing argument, the court listed the § 3553(a) factors and noted that it had "considered all those factors, although I won't mention each one individually." J.A. 207–08. The court determined that it would impose a sentence of 114 months, explaining as follows:

> I do think there's a tremendous need for personal incapacitation. Obviously we expect people to comply with the law while they're out, and then we expect them to comply with the law while they're in. And it's — it creates a dangerous situation if somebody's repeatedly possessing shanks and then using them, and you certainly have done that, which is not good and is violent and is very concerning to me. And it creates a dangerous environment for you, for other detainees, other inmates, and for correctional staff.

10

And so I've taken all those issues into account in fashioning the sentence. Won't go as high as the Government suggested, but I do think there is a tremendous need for personal incapacitation in this case, a need for a sentence to promote respect for the law, taking into account what I consider to be, you know, lawlessly violent conduct while in custody in the — in the jails here.

Having fully considered the entire record in the case, it's the judgment of the Court that Tyzheem Nixon is hereby committed to the custody of the Bureau of Prisons for 114 months. In imposing this sentence, I've considered all the arguments associated with Mr. Nixon in his lawyer's presentence — the sentencing memorandum, including his mental health issues, his childhood, his desire for psychiatric treatment.

J.A. 210–11. The court went on to state that it would have imposed the same sentence as an alternative variant sentence under § 3553(a) even without the heightened criminal history category. J.A. 213–14. Nixon timely appealed. J.A. 61.

III.

"This Court reviews all sentences—whether inside, just outside, or significantly outside the Guidelines range—under a deferential abuse-of-discretion standard." *United States v. Torres-Reyes*, 952 F.3d 147, 151 (4th Cir. 2020) (cleaned up); *see also Gall v. United States*, 552 U.S. 38, 51 (2007). "In applying the abuse-of-discretion standard, we review the district court's factual conclusions for clear error . . . and its legal conclusions *de novo*." *In re Grand Jury 2021 Subpoenas*, 87 F.4th 229, 250 (4th Cir. 2023).

"Reasonableness review has procedural and substantive components." *United States v. Elboghdady*, 117 F.4th 224, 233 (4th Cir. 2024) (quoting *United States v. Hargrove*, 701 F.3d 156, 160 (4th Cir. 2012)). "[W]e are required to analyze procedural reasonableness before turning to substantive reasonableness." *United States v. Provance*,

11

944 F.3d 213, 218 (4th Cir. 2019). "A district court commits procedural error by failing to calculate (or improperly calculating) the Guidelines range." *United States v. Smith*, 75 F.4th 459, 464 (4th Cir. 2023) (internal quotation marks omitted). We must reverse procedural error, unless "the error was harmless." *United States v. Gomez-Jimenez*, 750 F.3d 370, 379 (4th Cir. 2014), *as corrected* (Apr. 29, 2014) (quoting *United States v. Lynn*, 592 F.3d 572, 581 (4th Cir. 2010)). There is an effective presumption against harmlessness where a district court "improperly calculate[s] a Guidelines range." *See Elboghdady*, 117 F.4th at 237 ("Our holding [finding that the district court procedurally erred] is grounded in the principle that district courts may not improperly calculate a Guidelines range").

## IV.

Nixon asserts that his sentence is procedurally unreasonable for several reasons, all of which independently require vacatur for resentencing. First, he argues that the district court erred by considering dissimilar conduct in violation of U.S.S.G. § 4A1.3. Next, Nixon argues that the district court skipped steps in departing to a higher criminal history category, going straight from category III to category VI without considering intervening categories. Last, Nixon contends that the district court's finding that Nixon's conduct was not the product of his untreated mental health condition was clearly erroneous, as the district court completely disregarded unrebutted expert testimony to the contrary without justification. As explained below, Nixon is correct on all fronts.[2]

---

[2] Nixon also argues that the district court erred in not awarding acceptance of responsibility points for his guilty plea. Because we vacate the sentence on alternative (Continued)

12

A.

In determining that criminal history category III was inadequate, the district court erroneously relied entirely on dissimilar, post-offense disciplinary infractions. As noted in the PSR, this included several physical assaults and stabbings, as well as multiple instances in which Nixon was caught in possession of homemade shanks. J.A. 79–82. The district court stated that "it would be a dereliction on [its] part to ignore [this activity] for purposes of analyzing [Nixon's] inadequate criminal history." J.A. 200. This was an abuse of discretion.

1.

Under U.S.S.G. § 4A1.3, an upward departure may be warranted "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes[.]" U.S.S.G. § 4A1.3(a)(1). Such information "may include [p]rior *similar* adult criminal conduct not resulting in a criminal conviction." *United States v. Grubbs*, 585 F.3d 793, 803–04 (4th Cir. 2009); U.S.S.G. § 4A1.3(a)(2)(E)

---

grounds, we do not reach Nixon's argument on this issue. We acknowledge the broad discretion awarded to the district court on whether to award a reduction for acceptance of responsibility. U.S.S.G. § 3E1.1 cmt. n.5; *United States v. Bolton*, 858 F.3d 905, 915 (4th Cir. 2017). We also note that the limitation to only "similar" criminal acts, discussed herein, does not apply to the analysis of whether a defendant has accepted responsibility. *See id*. However, the district court must be mindful to consider Nixon's acceptance of responsibility in light of Dr. Utterback's report, as explained below. *See infra*, Part IV.C; *compare* J.A. 164.

13

(emphasis added).[3, 4]   As the district court acknowledged, Nixon was not "criminally prosecuted for a lot of th[e] activity" referenced in the PSR but "he could have been." J.A. 200. Criminal conduct is considered similar if it is the same type of conduct as the offense or the "relevant conduct surrounding the offense." *United States v. Dixon*, 318 F.3d 585, 590–91 (4th Cir. 2003).

The limitation that an upward departure can only be based on uncharged, similar conduct reflects a careful balance between protecting the rights of the accused and ensuring a sentence properly reflects the likelihood of recidivism for an individual defendant. This balance is critical, as "[t]he state poses no greater threat to individual liberty than when it proceeds in a criminal action." Rachel E. Barkow, *Separation of Powers and the Criminal Law*, 58 Stan. L. Rev. 989, 995 (2006). Rather than present its case before a jury and prove Nixon's guilt beyond a reasonable doubt, the government can utilize sentencing—with its lower standard of proof and lack of a jury—to punish Nixon for his uncharged transgressions. But sentencing is not and cannot be a backdoor around the Constitution. The Sentencing Commission, fulfilling Congress's charge, carefully structured the upward

---

[3] Every circuit to have reached the question of whether "prior" conduct allows consideration of conduct occurring after the offense of conviction but before sentencing has concluded that § 4A1.3(a)(2)(E) does not limit consideration of conduct to only that occurring before the offense of conviction. *See United States v. Myers*, 41 F.3d 531, 533–34 (9th Cir. 1994) (collecting cases). This Court has affirmed the use of post-offense criminal conduct in an unpublished opinion, *United States v. McNeal*, 380 F. App'x 260, 262 (4th Cir. 2010), but has never otherwise confronted the issue. We assume without deciding that consideration of post-conviction conduct is permissible under § 4A1.3(a)(2)(E).

[4] District courts are permitted to consider serious *dissimilar* conduct that results in a conviction and sentence of more than one year. U.S.S.G. § 4A1.3(a)(2)(B).

14

departure Guidelines to ensure that, unless the uncharged conduct is related to the offense of conviction or almost identical in nature, the government must bring an indictment and secure a conviction before it may use that conduct in a sentence for a different crime. *See United States v. Robertson*, 568 F.3d 1203, 1213 (10th Cir. 2009) (explaining the Guidelines' rationale that repeatedly engaging in the "same criminal behavior" indicates "an increased likelihood that the offense will be repeated yet again."). It is only in limited circumstances that the Commission has determined that the benefits of properly capturing the sentence for a given offense outweigh the costs to what would otherwise be a defendant's constitutional rights. Outside of the enumerated exceptions, this Court must jealously guard the Commission's chosen delicate balance. And in the case of the similarity requirement, we have repeatedly done so.

The dissent takes a different view when it comes to the similarity requirement. It faults the majority for inventing a rule that upward departures must be based on one of the enumerated criteria listed in § 4A1.3. Diss. Op. at 34–35. The dissent emphasizes the words "may include" at the beginning of that list to engage in an entirely new interpretation of § 4A1.3 and hold that it is not exhaustive.

We reject this argument. There was a time when the list of exceptions was believed to be not exhaustive. Before 2003, the list began with the words "may include, but is not limited to, information concerning." That is why this Court in 1990 observed that the list constitutes "a broad noninclusive range of examples." *United States v. McKenley*, 895 F.2d 184, 186 (4th Cir. 1990). Amendment 651 brought the language in § 4A1.3 to its current version.

15

After this change in the language, this Court presented a different rationale to treat the list as not exhaustive: the content of an unrelated application note. This Court reasoned that because an application note in § 1B1.1 informs us that "[t]he term 'includes' is not exhaustive," then the list in § 4A1.3 must not be exhaustive either. *See, e.g.*, *United States v. Robinson*, 456 F. App'x 283, 290 (4th Cir. 2011) (per curiam) (citing U.S.S.G. § 1B1.1 cmt. 2). This reasoning was unsound *ab initio* because the application note specifies that its definition is "not designed for general applicability" and that its "applicability to sections other than those expressly referenced must be determined on a case-by-case basis." U.S.S.G. § 1B1.1 cmt. 2. Nowhere in the application notes for § 4A1.3 is the definition for "includes" expressly referenced even though those notes expressly reference definitions from other comments. *See* U.S.S.G. § 4A1.3 cmt. 1.

These cases were decided without the benefit of *United States v. Campbell*, 22 F.4th 438 (4th Cir. 2022), which clarified that courts should look to the Guideline commentary only when the Guideline is genuinely ambiguous. This case then presents the first opportunity for this Court to reassess in a published opinion whether the reasoning from our earlier decisions remains tenable.

These earlier cases and the dissent's assertions are not tenable as a matter of statutory interpretation. The Supreme Court has noted that the word "may" has an elusive definition: sometimes it is permissive, yet other times it is mandatory. *See Zadvydas v. Davis*, 533 U.S. 678, 697 (2001). Here, the Guidelines provide that district courts are allowed to depart if reliable information indicates that the criminal history category misrepresents the likelihood of recidivism. The next paragraph specifies that "reliable

16

information *may* include" one of five criteria, including similar conduct lacking a conviction. There is no indication that "may" is permissive, nor that this list is *not* exhaustive, as would be made clear by the inclusion of the phrases "including, but not limited to" or "such as." Further, it is well-established under the *expressio unius* canon of statutory interpretation that "where a law expressly describes a particular situation to which it shall apply, what was omitted or excluded was intended to be omitted or excluded." *United States v. Roane*, 51 F.4th 541, 548 (4th Cir. 2022) (citing *Reyes-Gaona v. N.C. Growers Ass'n*, 250 F.3d 861, 865 (4th Cir. 2001)). The Guidelines specifically allow courts to consider dissimilar conduct yielding a sentence of more than a year, and similar conduct that lacks a conviction.

The dissent also errs by contending that "when the Sentencing Commission intended to exclude from consideration a particular type of information, it said so." Diss. Op. at 34–35. This argument misunderstands the prohibition created by § 4A1.3(a)(3). As this Court has found, this prohibition emphasizes the inability for arrest records to provide information reliable enough to form the basis for the upward departure, and it instead obliges sentencing courts to use more reliable sources to develop facts surrounding the arrests. *Dixon*, 318 F.3d at 591. For instance, an arrest record standing by itself is not reliable enough to form the basis for an upward departure based on prior similar adult criminal conduct not resulting in a criminal conviction. But this does not mean that everything save arrest records can be considered as the basis for an upward departure.

17

Under the dissent's interpretation, and despite the clear enumeration, the Guidelines also allow consideration of any type of conduct at all, rendering the inclusion of five listed criteria meaningless. We cannot agree that the Guidelines were drafted in such a way.

2.

Having found that the conduct relied upon for an upward departure must be similar, we now turn to whether the district court's reliance on Nixon's several acts of post-conviction acts of violence was permissible. When reviewing a departure under § 4A1.3(a)(2)(E), we must ensure that there is a direct corollary between the uncharged conduct and the offense of conviction, typically requiring an exact match between at least some part of the related conduct and the uncharged "similar" acts. *See, e.g.*, *Dixon*, 318 F.3d at 591 (finding prior "illegal possession of a firearm" conviction to be similar criminal conduct for a "firearm possession charge," and "three pending narcotics charges" to be "similar to the *relevant conduct* surrounding his federal firearm conviction, which included possession of narcotics with the intent to distribute"); *Grubbs*, 585 F.3d at 803–04 (finding uncharged instances of sexual abuse to be similar to the offense of sexual abuse at issue).

While Nixon's actions while incarcerated were reprehensible, they cannot be considered "similar criminal conduct" under § 4A1.3(a)(2)(E). None of the post-offense conduct relied upon by the district court is similar to the underlying offense: possession of a firearm and a small quantity of marijuana while a passenger in a vehicle. Nor is it similar to any relevant actions surrounding the underlying offense. Even the broadest framing of the circumstances giving rise to Nixon's conviction would include:

18

> Nixon's removal of his electronic monitor during supervision, his suspected involvement in shooting activity, his possession of a weapon knowing he was a prohibited person, his movements toward the gun when approached by law enforcement, his statements to police upon arrest, and the possession of a gun belonging to a recently deceased shooting victim.

Resp. Br. at 17. The only post-offense acts that possibly relate to any of this relevant conduct is the possession of sharpened metal rods, which, in this Court's view, is a stretch at best given the significant differences between firearms and metal rods, and the prison and non-prison contexts.

The dissent finds "felon in possession of a gun" and "inmate in possession of a shiv" to be quintessential examples of similarity because in both instances, Nixon possessed a weapon that he was not allowed to have. Diss. Op. 35. To start, the assumption that any felon with a firearm is planning to or in effect has already engaged in violence is incompatible with our constitutional emphasis on the right to keep and bear arms for self-defense. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 33, 70 (2022). Further, this analysis completely ignores that only a sliver of the conduct relied upon for the upward departure was analogous to his firearm charge as possession of a weapon as a prohibited person. Even if every instance of possession of any weapon that one is not allowed to have is *per se* similar, the district court's upward departure would still be based on information from far outside what can be permissibly considered.

The government provides only one authority from this Court for the proposition that similar conduct need not *exactly* match the conduct of the offense at issue or relevant conduct surrounding that offense. Resp. Br. at 17. That case involved an upward departure when sentencing the defendant for marijuana possession with intent to distribute, where

19

there was a prior conviction for possession of marijuana allegedly for personal use. *See generally United States v. Escano*, 205 F.3d 1335 (Table) (4th Cir. 2000) (unpublished). While not an identical context, the Court was faced with the same question of whether prior conduct was sufficiently similar to be considered at sentencing pursuant to U.S.S.G. § 4A1.2(e). While certain convictions are not included in the calculation of a criminal history score if they are more than a decade old, district courts can consider these remote convictions under § 4A1.3(a)(2)(E) if they are "similar." *See* U.S.S.G. 4A1.2, cmt. n.8. In an unpublished and non-binding opinion, this Court found the criminal possession of marijuana and repeated acts of drug distribution in both instances rendered the conduct sufficiently similar, despite the remoteness in time of those prior convictions. *Escano*, 205 F.3d 1335 at *2. As this Court explained, the offenses were sufficiently similar because they both "involve his possession of marijuana" and the defendant's "repeated convictions for drug-related offenses evidence his likelihood of recidivism." *Id.* Thus, the district court was permitted to consider these offenses in granting an upward departure.

Here, the government fails to show that there is a common level of similarity between Nixon's post-offense acts and the actual offense at issue in this case. Nixon's uncharged post-conviction conduct does not demonstrate a pattern of "repeated convictions" for felon in possession of a firearm offenses. *Escano*, 205 F.3d at *2. Nor does the uncharged conduct involve a similar element to the underlying offense, like a "controlled substance" or a firearm. *Id.* As such, *Escano* does little to suggest that the uncharged conduct in this case can be considered similar to the underlying offense.

20

It is true that some of our sister circuits have pushed the boundaries of what constitutes similar conduct. *See, e.g.*, *United States v. Goshea*, 94 F.3d 1361, 1363–64 (9th Cir. 1996) (finding conduct of impersonating a military officer to obtain jobs and access to officer's clubs and military bases substantially similar to conduct of impersonating a military officer to obtain money); *United States v. Mayo*, 14 F.3d 128, 131–32 (2d Cir. 1994) (finding prior arsons designed to fraudulently disadvantage financial institutions in their loan dealings with defendant to be sufficiently similar to the frauds prosecuted in the case at issue); *United States v. Robertson*, 568 F.3d 1203, 1214 (10th Cir. 2009) (affirming district court's consideration of violent criminal conduct involving firearms for a felon in possession of a firearm); *United States v. Bullock*, 35 F.4th 666, 672 (8th Cir. 2022) (affirming similarity of prior criminal firearms charge because both the acquitted conduct and present incident involved firearms). But, even if we were to accept the reasoning of these cases, all involved far more commonality between the uncharged conduct and underlying offense than what is presented here. To this Court's knowledge, no court has ever accepted the argument that illegal possession of a firearm is the same as possession or use of a sharpened metal rod. We decline the government's invitation to find that any acts involving possession of a weapon are inherently similar.

The Sentencing Guidelines permit a district court to consider dissimilar conduct so long as it results in a conviction and sentence of more than one year. U.S.S.G. § 4A1.3(a)(2)(B). But to protect the rights of a defendant, unrelated criminal conduct "not resulting in a criminal conviction" can only be considered for an upward departure if that conduct is similar—no matter that conduct's violent nature, or no matter how "not good"

21

and "very concerning" a court considers the conduct to be.  U.S.S.G. § 4A1.3(a)(2)(E); J.A. 210.  The district court's almost exclusive reliance on dissimilar conduct here renders the sentence procedurally unreasonable.

B.

In addition to relying on dissimilar conduct, the district court further erred by failing to consider intermediate criminal history categories and offenses levels.

Referencing U.S.S.G. § 4A1.3(a)(4)(B),[5] this Court requires district courts to apply an incremental approach when selecting an alternative criminal history category.  *United States v. Rusher*, 966 F.2d 868, 884 (4th Cir. 1992) (the judge may "move on to a still higher category only upon a finding that the next higher category fails adequately to reflect the seriousness of the defendant's record.").  "In light of the Commission's careful construction of the criminal history categories, when a judge concludes that a defendant's category is inadequate, a sentence in the range of the next higher category will usually be sufficient."  *Id.* at 895 (quoting *United States v. Coe*, 891 F.2d 405, 413 (2d Cir. 1989)).

"Section 4A1.3's mandate to depart incrementally does not, of course, require a sentencing judge to move only one level, or to explain its rejection of each and every intervening level."  *United States v. Dalton*, 477 F.3d 195, 199 (4th Cir. 2007).  And, as the dissent rightly points out, while a court should indicate its reasons for departing upward

_____

[5] While U.S.S.G. § 4A1.3(a)(4)(B), by its terms, only applies when a district court seeks to depart upward from a criminal history category of VI, this Court and our sister circuits have relied on this section in holding that district courts must always apply an incremental approach to sentencing departures. *Rusher*, 966 F.2d at 884 n.10 (noting that courts have adopted the incremental approach in reference to § 4A1.3).

under § 4A1.3, it need not "incant the specific language used in the guidelines," *Rusher*, 966 F.2d at 882, or "go through a ritualistic exercise in which it mechanically discusses each criminal history category [or offense level] it rejects en route to the category [or offense level] that it selects," *Dalton*, 477 F.3d at 199 (quoting *United States v. Lambert*, 984 F.2d 658, 663 (5th Cir. 1993)).

However, the requirement of providing specific reasons for departing "is not satisfied by a general recitation that the defendant's criminal history category or offense level underrepresents, in the sentencing court's opinion, the defendant's criminal record or the seriousness of the charged offense." *Rusher*, 966 F.2d at 883 (quoting *United States v. Wells*, 878 F.2d 1232, 1233 (9th Cir. 1989) (per curiam)).  And "[t]he farther the [sentencing] court diverges from the advisory guideline range," the more a reviewing court must "carefully scrutinize the reasoning offered by the district court in support of the sentence." *Provance*, 944 F.3d at 219–20 (cleaned up).

In the case before us, it is clear that the district court inadequately considered intermediate categories before departing from category III to category VI and increasing the offense level to 24.  The district court noted that it is "instructed to move incrementally" but then only cursorily stated:  "I find III to be woefully inadequate, so I move to the right towards criminal history category VI."  J.A. 201.  There was no further explanation of how the court arrived at that value.

The error inherent in the district court's failure to consider intervening categories in this case is best demonstrated by this Court's precedent in *Dalton*.  There, we rejected an upward departure of "almost twice the top of the advisory guidelines range" where the

23

court only provided a "fairly general statement that it 'considered lesser offense levels and found them to be inadequate.'" *Dalton*, 477 F.3d at 199–200. This Court then vacated the sentence and remanded for a more thorough analysis "[i]n view of the magnitude of the district court's departure." *Id.* at 200.

Here, the district court departed from a Guideline range of 41–51 months to a sentence of 114 months, even more extreme than the departure in *Dalton*. J.A. 70, 211. The district court did not even say it considered the intervening categories; only that it was *supposed to* and that it found "category III to be woefully inadequate." J.A. 201. The dissent faults us for "not tak[ing] the district court at its word." Diss. Op. 36. But avoiding a "ritualistic exercise" cannot permit the absence of a process altogether. And given the magnitude of the court's departure here, our precedent requires far more explanation. *See United States v. Chatterji*, 46 F.3d 1336, 1343 (4th Cir. 1995) ("conclusory statements by the district court" are insufficient to justify upward departure from Guidelines range); *Rusher*, 966 F.2d at 883 (vacating sentence where "general recitation that the defendant's criminal history category or offense level" is underrepresentative was really an attempt to "bypass[] the criminal history categories entirely in [the court's] desire to impose a particular sentence.") (cleaned up). The district court's departure from category III was procedurally unreasonable.

As an additional note, the cases cited by the government only illustrate the inadequacy of the district court's analysis here. *See* Resp. Br. at 22–23. For example, in *United States v. Nance*, the district court gave at least some explanation for how it considered and rejected intervening criminal history categories, stating: "if I go forward

24

from a level five to a six, 24 to 30 doesn't capture it. It's only when I go down to a level 17 that I begin to think that I'm in a range that will accomplish the purposes of sentencing." 957 F.3d 204, 211 (4th Cir. 2020). This Court upheld that upward departure based on the mention of the intermediate categories and a clear demonstration by the district court that it went step-by-step, as required. *Id.* at 212–15. This is quite different from the district court's immediate jump to category VI, and it only serves to highlight the reversible error committed below. In our view, it would be a rejection of our precedent to find that no additional explanation is required in this case, especially when, as here, an upward departure more than doubles the Guideline range. And while some may place reduced value on procedural minimums in sentencing, arguments about the value of procedural rights for criminal defendants do not trump precedent that requires more from a district court when departing upward to such a significant degree. The district court abused its discretion in more than doubling Nixon's sentence without even acknowledging other criminal history categories on the way. Even if the district court could have relied on dissimilar evidence in departing upward, this error alone renders the sentence procedurally unreasonable. By only paying lip service to the requirements of our precedent, the district court failed to ensure that Nixon's sentence was not "greater than necessary" to satisfy the purposes of sentencing. 18 U.S.C. § 3553(a).

## C.

In addition to the above errors, the district court rejected the testimony of an unrebutted medical expert without any justification, instead relying on no evidence to support its finding that Nixon's originally calculated criminal history category of III

25

underrepresented his likelihood of recidivism.  The court's summary rejection of such unrebutted expert testimony renders its finding clearly erroneous.

We review the district court's factual conclusions for clear error.  *Bolton*, 858 F.3d at 911.  "[W]hile clear error review is deferential, it is not toothless." *Butts v. United States*, 930 F.3d 234, 238 (4th Cir. 2019) (citing *United States v. Wooden*, 693 F.3d 440, 452 (4th Cir. 2012)).  "This Court has identified four grounds for reversing factual findings:  (1) they were derived under an incorrect legal standard, (2) they are not supported by substantial evidence, (3) they were made while ignoring substantial evidence supporting the opposite conclusion, and (4) they are contrary to the clear weight of the evidence." *Heyer v. U.S. Bureau of Prisons*, 984 F.3d 347, 355 (4th Cir. 2021).

The district court both "ignor[ed] substantial evidence supporting the opposite conclusion" and made a finding "not supported by substantial evidence," *id.*, when it completely rejected Dr. Utterback's opinion that Nixon's infractions during incarceration were the result of his untreated Bipolar I disorder, J.A. 199–200.  Specifically, the district court characterized Nixon's false denial that he had a weapon and his statement to prison officials that he could only receive a maximum 120-month sentence as evidence of "planning and not some manic episode as a result of bipolar," J.A. 210, although the court provided no evidence for this assertion.  Based on these incidents, the court also found that there was "a tremendous need for personal incapacitation" because Nixon's conduct created a dangerous environment for him, for other inmates, and for correctional staff.  J.A. 210.  But the court gave little consideration to the possibility that these violent acts may not occur in the future with proper treatment.

26

The district court's conclusion stands in stark contrast to the testimony of the only expert offered in this case. Dr. Utterback explained that manic episodes can last days or weeks. J.A. 113. These episodes are characterized by symptoms that can include "[e]xcessive involvement in activities that have a high potential for painful consequences." *Id.* As Dr. Utterback continued,

> Mania in particular tends to trigger aggressive emotions and anger. The racing thoughts and high energy levels may leave the individual feeling angry, irritable, and frustrated. Those angry emotions[,] in turn, can cause aggressive and inappropriate behaviors. When things don't go the way the manic person envisions, or if someone tries to rein in a manic person, the individual may lash out . . . . These behaviors are outside of the person's control.

J.A. 114. Most importantly, Dr. Utterback stated that these symptoms were treatable. In her view, with weekly psychotherapy and proper medication, Nixon would not have engaged in the violent behavior that justified the upward departure and variance. *Id.* And as Nixon notes, this is corroborated by a two-month period in which Nixon received proper medication, during which time he received *zero* disciplinary violations. J.A. 143; *see also* J.A. 140–42.

Both the dissent and the district court commit the same error in misunderstanding Dr. Utterback's testimony. The dissent would have us affirm on the basis that the court below properly rejected the argument that Nixon's lack of "impulse" control was responsible for his acts that required "planning." Diss. Op. 37–38. But as noted above, Dr. Utterback explained that impulsive behavior can last days or weeks. J.A. 113. The evidence of "planning" focused on by the district court is explained to be part of a longer-term manic episode, involving impaired decision-making for an extended period rather than in only

27

isolated instances. Thus, to reject Dr. Utterback's conclusion that Nixon's Bipolar disorder caused his actions because those actions required more than an immediate impulse decision reflects a lack of understanding of her testimony. This failure to correctly comprehend the evidence presented by Dr. Utterback is reversible error.

Based on the evidence before the court, we hold it was clearly erroneous to reject Dr. Utterback's opinion without any countervailing evidence nor stating any reasons to discredit the expert's testimony. As we explained in *Heyer*, a district court's "conclusory dismissal" of the testimony of a medical expert with "minimal citations in support of this conclusion compared to the full evidence in the record compel[s] us to hold that the district court clearly erred." 984 F.3d at 360. There, the district court rejected expert testimony about deaf individuals' difficulties with communication in prison. *Id*. at 359–60. The district court then affirmed the prison's refusal to allow Heyer, a deaf prisoner, to make video calls based on the court's conclusion that Heyer could read and write effectively and that written communication was sufficient. *Id*. at 360–61. It cited no evidence for this finding, instead poking holes in the medical expert's testimony without any counterevidence to support the supposed problems with the expert's methodology. *Id*. at 360. This Court reversed, finding that the lack of evidence to support the district court's position could not be justified. Further, we held that other evidence in the record, including Heyer's own testimony, corroborated the expert report's conclusions, which rendered the district court's conclusion clearly erroneous. *Id*. at 361–62.

Here, the government presented no evidence of Nixon's mental health or bipolar disorder generally. Faced with a one-sided record, the district court substituted its personal

28

views on mental health and human behavior for those of a medical professional.  Even worse than in *Heyer*, the district court did not even identify any flaws in Dr. Utterback's methodology, instead simply asserting its disagreement with Dr. Utterback's medical opinion.  J.A. 201.  And given the corroborating evidence of Nixon's good behavior when he has received proper treatment, J.A. 143, it was clearly erroneous for the district court to reject Dr. Utterback's testimony.  Because the expert testimony was rejected in error, the district court's finding that criminal history category III underrepresented Nixon's likelihood of recidivism cannot pass muster.  The only expert to provide testimony in this case found that Nixon's conduct was a result of his mistreated mental health condition and that, if treated, Nixon would no longer engage in violent behavior.  J.A. 114.  This finding was corroborated by the record, including evidence that Nixon received no disciplinary infractions while receiving the same treatment recommended by Dr. Utterback.  J.A. 143.  A district court cannot just disregard evidence that is contrary to its predisposed conclusions without any counterevidence, no matter how informed on the subject the district court may think itself to be.  *Heyer*, 984 F.3d at 361.

\*    \*    \*

The district court based its entire upward departure on Nixon's dissimilar acts, and it skipped steps in getting to its desired sentencing range, both of which we have explained were independently abuses of discretion.  But even without those errors, the court's rejection of Dr. Utterback's report led to a clearly erroneous finding of an inflated likelihood of recidivism.  All in all, Nixon's sentence was procedurally unreasonable for three independent reasons, each of which could have required vacatur alone.

29

V.

Having found the sentence before us to be procedurally unreasonable, we now turn to whether the sentencing errors are nevertheless harmless. *Gomez-Jimenez*, 750 F.3d at 379. As this Court has repeatedly explained, we are bound by the "principle that district courts may not improperly calculate a Guidelines range." *Elboghdady*, 117 F.4th at 237. Even the "decision to impose a lenient sentence does not correct [a procedural] . . . error." *Id.*

Given the proper guideline sentencing range of 41–51 months, we cannot possibly find the district court's sentence of 114 months to be harmless error. The compounded procedural errors yielded a Guideline range completely out of step with that compelled by the circumstances of this case. We have already found much smaller disparities alone to be enough to negate harmlessness for a procedurally unreasonable sentence. *See Elboghdady*, 117 F.4th at 237 (declining to find harmless error where the proper Guidelines range was 63–78 months but the district court imposed a sentence of 120 months). Furthermore, any upward variance that could support this sentence would have to be based on an unexplained rejection of Dr. Utterback's testimony, which we have already found to be legal error. Thus, our precedent requires a finding that the procedural errors here are not harmless and that we remand for resentencing.

VI.

As even the district court noted, Nixon could have been separately charged with and convicted of the violent acts described above. For reasons unknown, the government elected not to do so. Instead, the government sought to punish Nixon through sentencing

30

for an unrelated offense, circumventing Nixon's right to a jury trial and the heightened burdens of proof that come with new criminal proceedings. While the sentencing Guidelines allow some consideration of uncharged conduct, the district court here effectively convicted and sentenced Nixon for unrelated, dissimilar conduct, which undermines the fundamental guarantees of our Constitution that the sentencing Guidelines are structured to protect.

This opinion is far from an endorsement of the excessively violent conduct upon which the district court based its heightened sentence. Rather, we base our reversal on the principle that our procedural minimums must be applied fairly to all. If this principle is to have any meaning, then the district court's several procedural errors and complete disregard for Nixon's untreated mental health condition, which together led it to more than double Nixon's sentence, compel our reversal.[6] We reject the notion that a district court can set aside these procedural requirements just to "err[] on the side of caution." Diss. Op. 40. If that were the law, then this Court would be powerless to review any sentence in any case, as a district court could always set aside the Guidelines to increase a sentence out of an abundance of caution.

Based on the above, we vacate the sentence and remand with instructions that the district court recalculate Nixon's criminal history category without improper consideration

---

[6] "Having found an abuse of discretion in the district court's sentencing procedure, we decline to address [Nixon's] substantive sentencing arguments." *Elboghdady*, 117 F.4th at 237 n.10. However, we note that our findings regarding the rejection of Dr. Utterback's testimony apply equally to the district court's § 3553(a) analysis.

of dissimilar conduct, with consideration of intermediate criminal history categories, and without unwarranted and unexplained rejection of Dr. Utterback's crucial testimony.[7]

*VACATED AND REMANDED WITH INSTRUCTIONS*

---

[7] "We emphasize, however, that this remand does not mean the government gets a second bite at the apple." *United States v. Pettus*, 90 F.4th 282, 287 (4th Cir. 2024). "Rather, the district court should make its determination . . . on the record as it exists." *Id.* (citing *United States v. Rowe*, 919 F.3d 752, 763 (3d Cir. 2019)).

PAMELA HARRIS, Circuit Judge, dissenting:

I appreciate the majority's careful attention to Mr. Nixon's circumstances and sentencing. In my view, however, the defendant's 114-month sentence for possession of a firearm as a felon, *see* 18 U.S.C. § 922(g), is neither procedurally flawed nor substantively unreasonable, and I therefore respectfully dissent.

I begin with the district court's upward departure under § 4A1.3(a)(1) of the Sentencing Guidelines, predicated on its finding that Nixon's criminal history substantially underrepresented his likelihood of recidivism. That determination rested largely on Nixon's violent conduct while in custody awaiting sentencing on his § 922(g) offense. J.A. 192-99.[1] As the majority recounts, that conduct included multiple instances in which Nixon assaulted or stabbed his fellow inmates, one of which led to new felony charges against him. For context, I would add just a bit of detail on one later incident that was important to the district court's thinking: Upon his arrival for a court appearance at the Terry Sandford Building in Raleigh, North Carolina, Nixon was found to be concealing in his rectum a piece of metal, four inches long and sharpened at one end like a "makeshift . . . weapon." J.A. 175. When asked by a deputy United States marshal why he had a "shank," Nixon indicated that it was for "people like" the marshal who was then restraining him. J.A. 176. He also advised the deputy that the maximum sentence on his § 922(g) offense was 120 months, and that they "couldn't do anything else to him." *Id.*

---

[1] The majority assumes without deciding that § 4A1.3(a)(2) allows for consideration of conduct after the offense of conviction. I am not sure that we need to reserve that point, in part because every court of appeals to consider the question has agreed on it, and in part because Nixon himself expressly concedes the question. *See* Br. of Appellant at 14 n.1.

33

Accounting for all of that post-offense conduct, as well as the violent nature of Nixon's prior felony, the sixty infractions he incurred while in state custody, and his multiple violations of post-release supervision, the district court found an extremely high risk of recidivism – "as close to 100 percent as it can be" – that was not reflected in Nixon's criminal history category of III.  J.A. 200; *see id.* at 199 (summarizing "this history that I've recounted of violence and failure to comply with the rules and even engaging in violence while in custody").  I am hard pressed to see how that amounts to an abuse of the district court's broad discretion.

The majority first faults the district court for not adhering to a rule that upward departures may be based on uncharged conduct only if it is "similar" to the charged offense.  With respect, I do not see where that rule comes from.  It is true that "[p]rior similar adult criminal conduct not resulting in a criminal conviction" is included in a list of "Types of Information" on which a district court may rely in departing upward.  *See* U.S.S.G. § 4A1.3(a)(2)(E).  But that list does not purport to be exhaustive.  Instead, § 4A1.3(a)(1) allows for an upward departure when any "reliable information" indicates a substantial underrepresentation of the likelihood of recidivism, and § 4A1.3(a)(2) provides only that such "information [] *may include*" the listed types.  U.S.S.G. § 4A1.3(a)(2) (emphasis added); *see* J.A. 192-93 (explaining that § 4A1.3(a) gives "a non-exhaustive list of things that a court might consider").  And when the Sentencing Commission intended to exclude

34

from consideration a particular type of information, it said so.  *See* § 4A1.3(a)(3) (prohibiting reliance on a "prior arrest record itself" in departing upward).[2]

In any event, I disagree with the majority that Nixon's charged conduct is not "similar" to his post-arraignment criminal conduct.  We do not have the benefit of the district court's thinking on this issue, because Nixon never raised it before that court.[3]  But "felon in possession of a gun" and "inmate in possession of a shiv" strike me as very similar:  As to both, the defendant's status (as a felon, as an inmate) prohibited him from having a weapon; as to both, the defendant willfully flouted that restriction; and as to both, there followed the potential or actuality of violence and danger.  There may be "significant differences between firearms and metal rods," as the majority observes – even when the metal rods are sharpened for use as weapons – but I do not believe the "similarity" analysis needs to be conducted at that level of granularity.  *See United States v. Dixon*, 318 F.3d 585, 589 (4th Cir. 2003) (finding narcotics charges "similar" to a firearm offense, based on an "analysis focus[ed] more broadly" on a defendant's relevant conduct).

---

[2] The majority traces our precedent on this issue, which predates *United States v. Campbell*, 22 F.4th 438 (4th Cir. 2022), and finds that we have our "first opportunity . . . to reassess in a published opinion" whether the list in § 4A1.3(a)(2) remains non-exhaustive.  Because my assessment that it does is based on the text of the Guideline and not on commentary, *Campbell* has no bearing.  But if I thought *Campbell* might shed light on the meaning of § 4A1.3(a)(2), I would wait for a better "opportunity" to address that question in a published opinion – perhaps one in which a party had actually raised the issue, giving us the customary benefits of party presentation, like briefing.

[3] Because the defendant forfeited this claim before the district court, our review ordinarily would be for plain error only.  *See United States v. Smith*, 75 F.4th 459, 464–65 (4th Cir. 2023).  For the reasons given above, I find no error in the district court's analysis, let alone one that would qualify as "plain."

The majority next finds error in the district court's selection of a new Guidelines range, on the ground that the court failed to follow the "incremental" approach for upward departures. *See United States v. Dalton*, 477 F.3d 195, 199 (4th Cir. 2007) (explaining that a court "should move to successively higher categories only upon finding that the prior category does not provide" an adequate sentence). But the district court expressly acknowledged that it was "instructed to move incrementally" in identifying an appropriate criminal history category and Guidelines range, and concluded that "*having done that*," it had moved "to the right" across the sentencing chart to a criminal history category of VI and "down" the chart to an offense level of 24. J.A. 201 (emphasis added). I see no reason not to take the district court at its word.

The majority does, pointing to the fact that the court started at category III and ended at category VI without discussing the categories in between. But we have made clear that the incremental approach "does not [] require a sentencing judge to . . . explain its rejection of each and every intervening level." *Dalton*, 477 F.3d at 199 (internal quotation marks omitted). If the extent of the departure is the majority's concern, then that is addressed by the district court's thorough explanation of why it believed category III "woefully inadequate" and only category VI – combined with additional steps up through the offense levels – sufficient to capture Nixon's risk of recidivism. J.A. 192-200. Nothing would be served by requiring the district court also to spell out the obvious fact that if category VI is appropriate, then categories IV and V are not. *See Dalton*, 477 F.3d at 199 (assuring that a court need not "go through a ritualistic exercise in which it mechanically discusses each

36

criminal history category [or offense level] it rejects en route to the category [or offense level] that it selects") (internal quotation marks omitted).

Finally, the majority disagrees with the district court's assessment of the opinion of Dr. Utterback, a psychiatrist who conducted two teleconference interviews with Nixon while he was in custody and then submitted a report. The report predated two final incidents that occurred just weeks before Nixon's sentencing – one in which Nixon, found with a "filed down" metal rod, reportedly threatened to cut off an officer's head; and the one in which Nixon attempted to bring a shiv into the Terry Sanford Building to use against United States marshals – and so it could not speak to all of Nixon's post-arraignment criminal conduct. But in her report, Dr. Utterback did opine that Nixon's earlier prison "infractions" – stabbings, assaults, and hidden makeshift weapons – were most likely the result of Nixon's bipolar disorder.

Although the majority describes Dr. Utterback's opinion as unrefuted, that is not quite right. As defense counsel presented it at sentencing,[4] Utterback's view was that Nixon's assaults and stabbings and homemade weapons were "quintessential *unplanned* behavior," impulsive reactions rather than "the product of some sort of deliberate premeditated decision." J.A. 188 (emphasis added). But the government put on evidence

---

[4] Dr. Utterback did not testify at Nixon's sentencing, but the district court considered and discussed her report, *see*, *e.g.*, J.A. 199-200, and defense counsel ably incorporated that report into her arguments, as described above.

37

to push back on that view, with witnesses explaining that it takes time and planning to create and conceal a weapon in prison, and deliberate forethought to hide a shank on one's person in preparation for an upcoming transport to a federal building.  For the district court, this was the crux of the matter:  Defense counsel, relying on Utterback's evaluation, was insisting that Nixon's post-arraignment criminal activity involved "no planning," while the evidence in front of it – especially the episode at the Terry Sanford Building – was to the contrary.  J.A. 191 ("[T]ell me how you make an argument about no planning.  When somebody's told you're going to go to Terry Sanford . . . and then you put a 4-inch metal shank in your rectum seems to be pretty planned to me."); *see also* J.A. 200 (rejecting opinion that "this is [] impulsive behavior on [Nixon's] part").  Perhaps we would have assessed the record differently.  But the district court fully and repeatedly explained why it was unpersuaded that Nixon had acted purely on "impulse," *see* J.A. 192, 200, 210, and I see no ground for setting aside its considered judgment as clear error or an abuse of discretion.[5]

Last, there is the question of harmless error.  As the majority notes, the district court expressly stated that if it erred in departing upward, it would impose the same 114 months of imprisonment as an alternative variant sentence under the § 3553(a) factors.  Ordinarily, then, we would treat any procedural error related to the upward departure as harmless so

---

[5] To be clear, the district court did credit much of Dr. Utterback's report.  As defense counsel observed at sentencing, the court credited Utterbuck's diagnoses and treatment recommendations, and it adopted all of the recommended treatment plans as part of its sentence.

long as Nixon's sentence would be procedurally and substantively reasonable as a variance. *See United States v. Nance*, 957 F.3d 204, 212 n.2 (4th Cir. 2020); *United States v. Gomez-Jimenez*, 750 F.3d 370, 382-83 (4th Cir. 2014). There is no dispute on the procedural reasonableness side; the district court thoroughly explained its sentence, and Nixon does not argue otherwise. Nixon does argue that the court's 114-month sentence – more than double the original 41-to-51-month range from which the district court departed – is substantively unreasonable, and while the majority seems to agree, I cannot.

According to Nixon, the district court went wrong by giving too much weight to his criminal conduct and the need for "personal incapacitation," J.A. 211, and not enough to his mental health condition. But weighing the § 3553(a) factors and striking the appropriate balance is at the core of a district court's "extremely broad" sentencing discretion, *see United States v. Jeffrey*, 631 F.3d 669, 679 (4th Cir. 2011), and I see no abuse of discretion here. A 114-month sentence would of course represent a very substantial variance. But the district court gave very substantial reasons for its sentence: Though it would not go as high as the government's requested 120 months, the district court explained, a sentence of 114 months was necessary to meet a "tremendous need for personal incapacitation" as well as to "promote respect for the law," considering not only the defendant's past history of violent criminal conduct, state prison infractions, and supervised release violations, but also his "lawlessly violent conduct while in custody" awaiting sentencing, which put in danger Nixon himself, "other detainees, other inmates, and [] correctional staff." J.A. 210-11.

39

The defendant argues, and the majority suggests, that the district court still failed to give sufficient attention to the possibility that Nixon's condition could improve with treatment. But the district court did, as noted above, provide for Dr. Utterback's recommended treatment as part of its sentence. And while Nixon emphasized at sentencing that he was seeking treatment and had done so in the past, he had failed to comply with mandated mental health treatment while on supervised release. At the end of the day, as defense counsel herself put it at sentencing, the district court was required to make an essentially predictive judgment, without "the benefit of gauging" where "Mr. Nixon can be in the future with treatment." J.A. 204. And while counsel sought a sentence "conveying [] optimism" about the future, *id.*, I do not think the court abused its discretion by instead erring on the side of caution.

Accordingly, I respectfully dissent.